**John Kenneth LANES, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 782–86.

Court of Criminal Appeals of Texas, En Banc.

March 15, 1989.

---

James A. DeLee, Port Arthur, for appellant.

James S. McGrath, Dist. Atty., and R.W. Fisher, Asst. Dist. Atty., Beaumont, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

WHITE, Judge.

Appellant, a juvenile certified for trial as an adult under Section 54.02, V.T.C.A. Family Code, was convicted of burglary of a habitation.[1] Punishment was assessed at twenty years imprisonment.

The Ninth Court of Appeals affirmed the conviction holding *inter alia,* that a fingerprint order, issued pursuant to Section 51.15, V.T.C.A., Family Code, provided sufficient probable cause to arrest and fingerprint a juvenile.[2] *Lanes v. State,* 711 S.W.2d 403 (Tex.App.—Beaumont 1986). Appellant petitioned this Court for discretionary review arguing that, independent of the Sec. 51.15, *supra,* probable cause requirement to fingerprint a child, Article I, Section 9 of the Texas Constitution and the Fourth and Fourteenth Amendments of the United States Constitution require probable cause to arrest a child in order to obtain his fingerprints. Because this raises a question of first impression, i.e., whether the probable cause requirement of Art. I, Sec. 9 and the Fourth Amendment applies in full force to a juvenile arrest,[3] we granted appellant's petition. Tex.R.App.Proc., Rule 200(c)(2). After having carefully considered the issues, we now hold that it does.

The facts of the case can be simply stated. Pursuant to a consent order from the juvenile court authorizing the taking of

---

1. This is the second time appellant has been tried for this offense. His first conviction was reversed by the Court of Appeals in an unpublished opinion.

2. The validity of the arrest is determined solely upon appellant's rights as a juvenile. The fact that appellant was later certified and tried as an adult has no retroactive impact on his initial arrest which was made prior to certification. *Vasquez v. State,* 739 S.W.2d 37, 41 (Tex.Cr.App. 1987).

3. We use the term "arrest" advisedly. The arrest of a child is often labeled as merely "detain-ment" or "protective custody." In the instant context, however, we find it appropriate to dispense with such euphemistic nomenclature. Such a position comports with Section 52.01(b), V.T.C.A., Family Code, which states, "[t]he taking of a child into custody is not an arrest except for the purpose of determining the validity of taking him into custody ... under the laws of and constitution of this state or of the United States." *See, In re Hartsfield,* 531 S.W.2d 149, 152 (Tex.Civ.App.—Tyler 1975, no writ) (child may be found guilty of resisting arrest).

appellant's fingerprints, a police officer arrested appellant at his high school, transported him to the police station and took his fingerprints.[4] The trial court as well as the Court of Appeals found that this order provided sufficient authority for an arrest. We disagree.

The issue presented is whether the probable cause requisite of Art. I, Sec. 9 of the Texas Constitution and the Fourth Amendment of the U.S. Constitution, applicable to the states through the Fourteenth, applies to the arrest of a child.[5] This precise issue has not been decided by our Court or the U.S. Supreme Court.[6] It has, however, long been settled that the Fourth Amendment is, to some undetermined extent, applicable to juvenile proceedings. This rule was best expressed in the seminal opinion on juvenile rights—*In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). The *Gault* Court stated, "[n]either the Fourteenth Amendment nor the Bill of Rights is for adults alone." *Gault, supra* at 13, 87 S.Ct. at 1436. To the same effect is *Haley v. Ohio*, 332 U.S. 596, 601, 68 S.Ct. 302, 304, 92 L.Ed. 224 (1948) and *Gallegos v. Colorado*, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962).

In order to best understand the unique framework from which this question is to be decided, a terse historical explanation of the juvenile system is necessary.[7] From its inception in Cook County, Illinois, in 1899, the juvenile justice system has been protectively maintained as a civil, socio-legal entity distinct and separate from the criminal justice system. The philosophical basis of this separation was to create a system wherein juveniles were rehabilitated rather than incarcerated, protected rather than punished—the very antithesis of the adult criminal system.

The creators of the juvenile system rejected the adult example as punitive, cruel

4. The record does not reflect whether appellant was released or detained following fingerprinting; however, the arrest of appellant at school in order to take him to the police station constitutes a seizure sufficient to invoke Art. I, Sec. 9 and Fourth Amendment protections. *Hayes v. Florida*, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985); *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969).

5. While in many instances Texas law is merely coextensive with Federal law, *see e.g. Eisenhauer v. State*, 754 S.W.2d 159, 162 (Tex.Cr.App. 1988) (plurality) cert. denied — U.S. —, 109 S.Ct. 127, 102 L.Ed.2d 101 (1988); *Vasquez, supra* at 44; *Brown v. State*, 657 S.W.2d 797, 798–799 (Tex.Cr.App.1983), the Texas Legislature has made evident its intent to give greater protections to its juveniles through enactment of the Texas Family Code. *See, Griffin v. State*, 765 S.W.2d 422, 425–426 (Tex.Cr.App. 1989). In Title 3 of the Code, Texas has statutorily enacted greater protections under state law than currently received under the Federal Constitution. For example, *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), denies juveniles the Federal Due Process guarantee of a jury trial whereas V.T.C.A., Family Code Sec. 54.03(c) requires a jury trial in delinquency proceedings. The Texas Family Code also extends to juveniles guarantees on which the U.S. Supreme Court has not yet ruled. For example, V.T.C.A., Family Code Sec. 54.03(e), excludes illegally seized evidence from trial and also prohibits an adjudication of delinquency founded only upon either uncorroborated accomplice testimony or the child's out-of-court statement. Therefore, although the protections offered by Art. I, sec. 9 and the Fourth Amendment are identical, our extension of the probable cause requirement inherent in both is based upon the particular and more protective purposes and policies of the Texas juvenile system. Consequently, although we rule on both Federal and State questions, we find it more appropriate to base our holding primarily on State constitutional grounds. *See, Eisenhauer, supra* at 162–163 (use of legislative pronouncements to determine whether to follow Federal law). We do, however, heavily rely on Fourth Amendment precedent since Texas has adopted such as authoritative of Art. I, sec. 9 protections.

6. Other Texas courts have, without stating a basis or rationale for doing so, implicitly required probable cause for the arrest of a child. *See, e.g., In re R.C.M.*, 660 S.W.2d 552 (Tex.Civ. App.—San Antonio, 1983, writ ref'd, n.r.e.); *Ciulla v. State*, 434 S.W.2d 948, 950–953 (Tex.Civ. App.—Houston [1st Dist.] 1968, no writ); *Continental Casualty Co. v. Miller*, 135 S.W.2d 501 (Tex.Civ.App.—Waco 1940, no writ). However, no court has specifically addressed the question in depth as we do now.

7. For more in-depth historical analysis *see, In re Gault, supra; Dendy v. Wilson*, 142 Tex. 460, 179 S.W.2d 269 (1944); Mennell, *Origins of the Juvenile Court: Changing Perspectives on the Legal Rights of Juvenile Delinquents*, 18 Crim & Del. 68 (1972). Mack, *The Juvenile Court*, 23 Harv.L. Rev. 104 (1909); Paulsen, *Kent v. United States: The Constitutional Context of Juvenile Cases*, 1966 Sup.Ct.Rev. 167.

and nonrehabilitative. This rejection was so extreme that even the vocabulary of the criminal system was discarded and replaced by more palatable terminology. Instead of being "arrested," "jailed" and "indicted," juveniles were to be "taken into custody," "detained" and a "petition" was to be filed for further "protection." Terms such as "trial," "criminal," and "imprisonment" were replaced with the softer terms of "hearing," "juvenile delinquent" or "a child in need of supervision," and "commitment." Medical metaphors such as diagnosis, rehabilitation, and counseling accented the new juvenile vocabulary in order to better characterize the type of treatment intended.

Further, the roles of the juvenile court's participants were to be very different than those of the adult. The State, instead of prosecuting, was to proceed as *parens patriae*,[8] with the welfare of the child being the penultimate and uniform goal. Social service personnel, probation officers, and clinicians, rather than lawyers, prosecutors, and prison guards, were to become the major forces in the system. Justice William O. Douglas best characterized the system's participants:

> I, the judge, and the bailiff and the other court attendants are like those on a hospital staff, dressed in white. We are doctors, nurses, orderlies. We are there not to administer law in the normal meaning of criminal law. We are there to diagnose, investigate, counsel and advise. We are specialists in search of ways and means to correct conduct and help reorient wayward youngsters to a life cognizant of responsibilities to the community.

William O. Douglas, Foreword to Wakin, *Children Without Justice: A Report by the National Council of Jewish Women* (1975) at v.

The entire juvenile system was engineered to create a setting of informality and openness in order to facilitate prompt, personalized and professional responses to the child's individual needs. A relaxed atmosphere was considered integral to engendering a rehabilitative sense of trust and dispelling fear and anxiety. The rigid, punitive and nonforgiving adult model was completely discarded and envisioned in its place was a system of sociological jurisprudence which dispensed a higher form of justice. Thus, our juvenile system was wrought from the most enlightened and humanitarian motives.[9]

These noble ideals, however, had the practical, paradoxical effect of denying juveniles many fundamental constitutional and procedural rights. *See generally*, Fox, *The Reform of Juvenile Justice: An Historical Perspective*, 22 Stan.L.Rev. 187 (1970). Because the system was designed to help rather than punish and all were charged with acting in the child's best interests, the procedural and constitutional rights inherent in the adult system were deemed unnecessary, and, in fact, counter to the juvenile system's goals. *McKeiver, supra* 403 U.S. at 544 fn. 5, 547, 91 S.Ct. at 1986 fn. 5, 1987; *In re Winship*, 397 U.S. 358, 375, 90 S.Ct. 1068, 1078, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). Procedural requisites were considered detrimental to flexibility, swiftness, openness, hon-

---

8. A latin term literally translated as "parent of the country." This concept originates from English Common Law equity courts where the Crown's paternal prerogative was exercised to declare a child a protective ward of the Crown when the parents failed to maintain the child's welfare. *Ex parte Crouse*, 4 Whart. 9 (Pa.1838) reflects the overwhelming breadth and strength of this doctrine. *See generally*, Worrell, *Pretrial Detention of Juveniles: Denial of Equal Protection Masked by the Parens Patriae Doctrine*, 95 Yale L.Jour. 174 (1985) [hereinafter cited as Worrell]; Pisciotta, *Saving the Children: The Promise and Practice of Parens Patriae*, 28 Crime and Delinq. 410 (1982).

9. Although the scholarly literature on this topic is voluminous, some excellent in-depth analyses of the philosophical roots of the juvenile system include: Gottfredson, Chandler & Cohen, *Legal Aim, Discretion, Antisocial Control: A Case Study of the Federal Youth Corrections Act*, 21 Criminology 95 (1983); Bortner, *Inside a Juvenile Court* (1982); Rothman, *Conscience and Convenience: The Asylum and its Alternatives in Progressive America* (1980) [hereinafter cited as Rothman]; Ryerson, *The Best-Laid Plans: America's Juvenile Court Experiment* (1978); Platt, *The Childsavers: The Invention of Delinquency* (2d Ed.1977).

esty and simplicity. *Gault, supra* 387 U.S. at 38–39, fn. 65, 87 S.Ct. at 1449–50, fn. 65. Throughout all proceedings discretion was maximized in order to provide optimal flexibility in diagnosis and treatment with the constant focus being the child's lifestyle and character rather than whether he committed the crime.

Ideally, information collected from and about the child would be used for the child rather than against him; thus, any limitations on the collection of information would only serve to subvert such aid. Because the system's aims were to be benevolent, solicitude individualized and intervention scientifically founded, there was no perceived need for the State's power to be narrowly circumscribed. Thus, as ironical as it may seem, one can logically deduce how the initial protective purposes of the system validly subrogated procedural and constitutional requisites. See generally, *Rothman, supra; Worrell, supra* at 176; Murphy, *Our Kindly Parent ... The State–The Juvenile Justice System and How It Works* (1977) (esp. chapters 1 & 3).

Especially at the genesis of the system, juveniles were denied virtually all rights. The adult adversarial construct was discarded along with the rights of confrontation, a record, a jury, a right to appeal, notice, proof beyond a reasonable doubt, and even counsel. *See, e.g., In re Gault, supra.* Juvenile proceedings were defined as civil rather than criminal, rendering inapplicable the rules of criminal evidence and their appropriate safeguards against admittance of prejudicial and inflammatory evidence. *See*, V.T.C.A., Family Code Sec. 51.17 (juvenile proceedings still maintained as civil action).

Thus, the juvenile system's protective rejection of the adult system came at the cost of the procedural and constitutional protections attendant thereto; a dubious tradeoff—to say the least—and, as was recognized early on, the results have been less than satisfactory. *Gault, supra* 387 U.S. at 21–31, 87 S.Ct. at 1440–46; Note, *Juvenile Delinquents: The Police, State Courts and Individualized Justice*, 79 Harv.L.Rev. 175 (1966); Allen, *The Border-land of Criminal Justice* (1964) at 18; Tappan, *Juvenile Delinquency* (1949) (esp. pp. 204–205).

As the system grew, it soon became overwhelmed. Crowded dockets and overburdened placement facilities doused and embittered rehabilitative spirits. The lack of procedural safeguards allowed the overwrought juvenile courts to operate in an atmosphere conducive to discretionary abuse, arbitrariness, and discrimination. *Gault, supra; Rothman, supra; Ryerson, The Best–Laid Plans: America's Juvenile Court Experiment* (1978). As early as 1937, Dean Pound likened the juvenile system to the Star Chamber stating, "[t]he powers of the Star Chamber were a trifle in comparison with those of our juvenile courts." Foreward to Young, *Social Treatment in Probation and Delinquency* (1937). Likewise in 1967 the Supreme Court recognized, "Juvenile Court history has again demonstrated that unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure." *Gault, supra* at 19, 87 S.Ct. at 1439. Thus, as practical reality brought into focus the injustices being wrought by the lack of procedural safeguards, Justice Frankfurter's famous words, "[t]he history of American Freedom is, in no small measure, the history of procedure" began to ring as true to the juvenile system as it had to its adult counterpart. *Malinski v. New York*, 324 U.S. 401, 414, 65 S.Ct. 781, 787–88, 89 L.Ed. 1029 (1945).

In response to this procedural injustice and as early as 1948, the Supreme Court began a case-by-case determination of the applicability of fundamental constitutional protections to the juvenile system. *In re Gault, supra,* was the grandfather case that activated a constitutional revolution wherein the juvenile system became subject to due process domestication. *Gault, supra* 387 U.S. at 22, 87 S.Ct. at 1441; Paulsen, *The Constitutional Domestication of the Juvenile Court*, 1967 Sup.Ct. Rev. 233.

Through time, eight central cases have been decided by the Supreme Court, each

delineating which specific rights were applicable to juvenile proceedings. In chronological order these cases established: (1) protections against coerced confessions, *Haley v. Ohio, supra,* (1948) (codified in V.T.C.A., Family Code sec. 51.09); (2) procedural requirements for certification hearings, *Kent v. U.S.,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966) (codified in V.T.C.A., Family Code sec. 54.02); (3) the rights of notice, counsel, confrontation cross-examination and protection against self-incrimination, *Gault, supra,* (1967) (codified in secs. 51.10, 53.01, 53.04, 53.06, 54.03); (4) proof beyond a reasonable doubt, *In re Winship, supra,* (1970) (codified in V.T.C.A., Family Code sec. 54.06); (5) that a jury trial is not required, *McKeiver, supra,* (1971) (*but see,* sec. 54.03, *supra,* requiring jury trial); (6) double jeopardy protections, *Breed v. Jones,* 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975) (codified in sec. 54.-02(a)(2) and (j)(3)); (7) the validity of pre-trial detention, *Schall v. Martin,* 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984); and, (8) a diminished Fourth Amendment standard applicable to school searches, *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). *See generally,* 4 Tex.Crim. Practice Guide, Sec. 110.05, pp. 110–14 through 110–15 (setting out Texas statutory juvenile rights enacted in the wake of *Gault* ).

From these eight foundation cases can be distilled a test to determine the extent to which constitutional protections are to be afforded juveniles. In order to determine whether and to what degree each protection extended to juvenile proceedings, the Supreme Court seemed to utilize a comparative analysis wherein the purposes and goals of the juvenile system were compared to the particular right being asserted. The Court balanced the function that a constitutional or procedural right served against its impact or degree of impairment on the unique processes of the juvenile court and then factored in consideration of the degree of realistic success the juvenile system had obtained. *See, e.g., Gault, supra* 387 U.S. at 22–26, 87 S.Ct. at 1440–43; *Kent, supra* 383 U.S. at 555–556, 86 S.Ct. at 1054–1055; *Breed, supra* 421 U.S. at 535–539, 95 S.Ct. at 1788–1790; *McKeiver, supra* 403 U.S. at 547, 91 S.Ct. at 1987; *T.L.O, supra* 469 U.S. at 337, 105 S.Ct. at 756. Because this balancing test constitutes a neutral, pragmatic analysis of all protective intentions involved, we find it valid and now adopt it as our own.

Application of such an analysis to the instant facts initially requires an exploration of the specific purposes of both the juvenile system and the constitutional right being asserted. The purposes of the Texas juvenile system have remained basically the same as they were at its inception. Conveniently, the specific intent of the Texas juvenile scheme is set out in Section 51.01, V.T.C.A., Family Code, which states,

This title shall be construed to effectuate the following public purposes:

(1) to provide for the care, the protection, and the wholesome moral, mental, and physical development of children coming within its provisions;

(2) to protect the welfare of the community and to control the commission of unlawful acts by children;

(3) consistent with the protection of the public interest, to remove from children committing unlawful acts the taint of criminality and the consequences of criminal behavior and to substitute a program of treatment, training, and rehabilitation;

(4) to achieve the foregoing purposes in a family environment whenever possible, separating the child from his parents only when necessary for his welfare or in the interest of public safety and when a child is removed from his family, to give him the care that should be provided by parents; and

(5) to provide a simple judicial procedure through which the provisions of this title are executed and enforced and in which the parties are assured a fair hearing and their constitutional and other legal rights recognized and enforced.

Additionally, Section 54.04(c), V.T.C.A., Family Code, requires that even after a finding of guilt, a child cannot be sentenced or detained unless the court further finds that he is in need of rehabilitation or that

the protection of the public or the child requires such. If the court does not so find, it must immediately release the child. *In re L.G.*, 728 S.W.2d 939 (Tex.App.—Austin 1987, writ ref'd. n.r.e.). Thus, as statutorily evidenced, rehabilitation and child protection remain as the pervasive and uniform themes of the Texas juvenile system. *In re Dendy, supra;* Steele, *Delinquent Children and Children in Need of Supervision*, 13 Tex.Tech L.Rev. 1145 (1982); Dawson, *Delinquent Children and Children in Need of Supervision: Draftsman's Comments to Title 3 of the Texas Family Code*, 5 Tex.Tech L.Rev. 509 [hereinafter cited as Draftsman's Comments].

Article I, sec. 9 and the Fourth Amendment are also protection attentive entities. Art. I, sec. 9 requires that the "people be secure in their persons ... from all unreasonable seizures and searches" and the Fourth Amendment requires: "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated." The purpose of these two provisions is the same—to safeguard the privacy and security of individuals against arbitrary governmental invasions. *T.L.O., supra* 469 U.S. at 335–338, 105 S.Ct. at 739–741. The true essence of this protection was best articulated very early on by Justice Brandeis in his dissenting opinion in *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), wherein he stated:

> The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfaction of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone —the most comprehensive of rights and the right most valued by civilized men.

*Olmstead, supra* at 478, 48 S.Ct. at 572. (Brandeis, J., dissenting).

The requirement of probable cause has historically been the stalwart enforcer of these privacy protections. *See, Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). Probable Cause is defined as that evidence which is sufficient to warrant a reasonable and prudent person in believing that a particular person has committed or is committing an offense. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). This requisite for a warrantless arrest protects individuals from being at the complete mercy of an officer's arbitrary caprice and prevents oppressive or prejudicial use of the power to arrest, while, at the same time, providing for community protection through valid law enforcement. *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Thus, the probable cause requisite safeguards citizens from rash and unreasonable interferences of privacy and from unfounded charges of crime.

With these basic purposes of the juvenile system and the probable cause requirement in mind, we now turn to compare the ramifications involved in enforcement of the two. One of the fundamental goals of the juvenile system is rehabilitation. Sec. 54.-04(c), *supra*. Essential to a rehabilitative environment is the proper attitudinal setting. Children have the strongest sense of justice—a product of youth, energy, and innocence. Such an inherent sense of justice, however, is fragile and can easily be turned to cynicism, helplessness, disillusionment and disrespect. Not only would such an attitude be contra-rehabilitative, but it could breed dissention and reactionary criminal behavior. *Gault, supra* 387 U.S. at 51, 87 S.Ct. at 1456.

A child arrested without valid reason by a seemingly all-powerful and challengeless exercise of police power would instantly intuit the injustice and react accordingly. Even a juvenile who has violated the law but is unfairly arrested will feel deceived and thus resist any rehabilitative efforts. *Schall, supra* 467 U.S. at 290–291, 104 S.Ct. at 2423 (Marshall, J., joined by Brennan and Stevens, JJ., dissenting); *Gault, supra* 387 U.S. at 26, 87 S.Ct. at 1443 (and

studies cited therein); Seidman, *Soldiers, Martyrs, and Criminals: Utilitarian Theory and the Problem of Crime Control,* 94 Yale L.Jour. 315, 347 (1984) [hereinafter cited as Seidman]; Wheeler and Cotrell, *Juvenile Delinquency–Its Prevention and Control* (1966) at 33. Inherent in youth is a malleable nature, and example can be the most formidable teacher. We must institutionalize justice in order to engender it among our youth. Affording a child the essentials of basic human dignity and announcing a respect for their autonomy through the extension of constitutional privacy protections can only further these efforts. *T.L.O., supra* 469 U.S. at 372–375, 105 S.Ct. at 759–761 (Stevens, J., joined by Marshall and Brennan, dissenting); *Doe v. Renfrow,* 451 U.S. 1022, 1027–1028, 101 S.Ct. 3015, 3018–3019, 69 L.Ed.2d 395 (1982) (Brennan, J., dissenting from denial of cert.).

Other important goals of the Texas juvenile scheme include protection of the community and the child. We as a society have decided that evidence less than that which would convince a reasonable man that an offense is being or has been committed does not constitute a sufficient showing of guilt to validate the deprivation of personal freedom attendant to an arrest. *Hawkins v. State,* 660 S.W.2d 65 (Tex.Cr.App.1983). Thus, implicit in the probable cause requirement is the presumption of innocence. The community need not be protected from a child who has presumptively not committed an offense. Nor does a child need to be protected from himself when he is not in trouble. *See, Winship, supra* 397 U.S. at 363–368, 90 S.Ct. at 1072–1075. Thus, requiring probable cause can only help to prevent such erroneous and unnecessary arrests.

The Texas juvenile system also seeks to avoid the taint of criminality in order to prevent recidivism and promote rehabilitation. The best method of avoiding attachment of a criminal taint is keeping the child completely out of the system. Studies are legion which conclude that once a child is arrested and becomes involved in the juvenile system the chances are almost non-existent that he can later withdraw himself or

be cleansed of the criminal taint. *See,* fn. 10, *post.* Even a single arrest can brand a child as a delinquent to outsiders. *McKeiver, supra* 403 U.S. at 545–547, 91 S.Ct. at 1986–1987. He could be stigmatized as criminal by teachers, parents, employers, and law enforcement officers and could be labeled as "cool" among his peers. Both reputations would be injurious. Discrimination by parents, teachers, employers, and police would severely limit the child's educational or employment goals or subject him to unwarranted arrests or police purview. Peer pressure could result in the child striving to live up to his "cool" reputation by committing other crimes. Requiring probable cause to arrest a child can only serve to reduce the risk that innocent youths will be so erroneously stigmatized.

An almost unavoidable consequence of arrest is detention. Pre-trial detention can be extremely destructive to a child's life and act as the determinative factor toward recidivism. The impressionability of juveniles can make even the most minimal experience of incarceration extremely injurious, and such injury is compounded where confinement is unfounded. All too quickly juveniles subjected to detention come to view society at large as "oppressive" and "hostile" and to "regard themselves as irremediably 'delinquent.'" *Schall, supra* 467 U.S. at 291, 104 S.Ct. at 2424 (Marshall, J., with whom Brennan and Stevens, JJ., join dissenting). One court noted:

It is difficult for an adult who has not been through the experience to realize the terror that engulfs a youngster the first time he loses his liberty and has to spend the night or several days or weekends in a cold, impersonal cell or room away from home or family.... The experience tells the youngster that he is no good and that society has rejected him. So he responds to society's expectation, sees himself as a delinquent, and acts like one.

*In re M,* 3 Cal.3d 16, 89 Cal.Rptr. 33, 43, fn. 25, 473 P.2d 737, 747, fn. 25 (1970). *See also, Gault, supra* 387 U.S. at 27, 87 S.Ct. at 1443; *Moss v. Weaver,* 525 F.2d 1258, 1260 (5th Cir.1976) ("Pretrial detention is

an onerous experience, especially for juveniles"). Such negative self-labeling is clearly counter-rehabilitative and can easily lead to self-fulfilling prophecy. It seems appropriate to require some probable cause evidence of wrongdoing before subjecting a child to the possibility of such detriment.

Further, the disruption that detention causes in a child's everyday life runs counter to any rehabilitative efforts. If the child is attending school, a week's absence while in detention would undoubtedly cause him to fall behind in his work thus enhancing disallusionment and contributing to the possibility that he will drop out. Further, if employed, the child's absence from work could cause loss of employment which further entangles him in a downward spiral. Lack of education and a poor employment record—two major causes of recidivism—can only serve to perpetuate delinquency. An arresting officer makes the first and, thus, most important decision of whether the child will be arrested and introduced into a system plagued with such negative possibilities. Such a momentous and determinative decision should at least be based on facts sufficient to sustain a reasonable belief that an offense was being or had been committed.

A further purpose of the juvenile system is preservation of the family environment either at home or, when detention is a necessity, to perpetuate a family-type atmosphere in the detention facility. Obviously, the optimal method of family preservation is keeping the family intact. By requiring some evidence of wrongdoing before disrupting the family and removing the child can only further this goal.

The old adage that a child, by virtue of his age, has no right to freedom but only a right to custody since he is presumably under constant parental control, *Gault, supra* 387 U.S. at 17, 87 S.Ct. at 1438; *Schall, supra* 467 U.S. at 265, 104 S.Ct. at 2410, does not withstand scrutiny or application in the instant context. Assuredly, a child is or should be under constant parental authority, but this comprises an entirely different form of custody than that of State detention. No one seriously argues anymore that State custody in any way approximates the family environment. Quite to the contrary, one judge summarized the realities of pre-trial detention thus:

> Over half a million juveniles annually detained in 'junior jails,' another several hundred thousand in adult jails, penned like cattle, demoralized by lack of activities and trained staff. Often brutalized. Over half the facilities in which juveniles are held have no psychiatric or social work staff. A fourth have no school program. The median age of detainees is fourteen; the novice may be sodomized within a matter of hours. Many have not been charged with a crime at all.

Wald, "Pretrial Detention for Juveniles" in *PURSUING JUSTICE FOR THE CHILD* (Rosenheim Ed.1976) at 119. *See also, Schall, supra* at 289, 104 S.Ct. at 2422–2423 (Marshall, J., joined by Brennan and Stevens, JJ., dissenting); *Gault, supra* 387 U.S. at 27, 87 S.Ct. at 1443; *D.B. v. Tewksbury,* 545 F.Supp. 896, 903 (Or.1982) (pretrial detention is "confinement without regard for human dignity or need"); *In re D.M.G.H.,* 553 S.W.2d 827 (Tex.Civ.App.— El Paso 1977, no writ) (evincing that, although statutorily prohibited, V.T.C.A., Family Code sec. 51.12(a), juveniles are still subject to detention in adult facilities); *Seidman, supra; Worrell, supra* at 178– 183. Further, history tells a story of State custodial abuse bordering on the barbaric. *See, e.g., Morales v. Turman,* 383 F.Supp. 53, 70–121 (E.D.1974), rev'd. 535 F.2d 864 (5th Cir.1976) (court ordered closure of Texas juvenile facilities which resulted in the immediate release of 500 children because of extremely abusive conditions); Wooden, *Weeping in the Playtime of Others, America's Incarcerated Children* (1976), ch. 1 [hereinafter cited as Wooden]; Murphy, *Our Kindly Parent the State–The Juvenile Justice System and How It Works* (1977) (esp. chapter 8). Surely we are beyond equating this institutional reality with parental supervision. To require probable cause prior to placement of a juvenile in such an institutional setting can only serve to prevent erroneous disruption and destruction of the family environment.

The foregoing discussion renders the conclusion that the purposes of the Texas juvenile system and the probable cause requirement of Art. I, sec. 9 are in harmony. The limitations imposed by these two protective entities do not conflict or undermine one another, but rather accommodate and enhance the goals sought by both. Probable cause protects the sanctity of personal freedom through the prevention of unnecessary arrests. The juvenile system was designed to protect and rehabilitate children. We in no way see how imposing a probable cause requirement will deter juvenile courts from pursuing its ameliorative goals.

The final consideration to be factored in is the realistic fact that, even at the expense of procedural protections, the exalted ideals of the juvenile system have failed in achievement. In *Haley v. Ohio, supra,* the first case on juvenile rights, the Supreme Court recognized, even at that early date, that the system as designed was not working. *Haley, supra* 332 U.S. at 601, 68 S.Ct. at 304. Many of the foundation cases following *Haley* discussed, each with growing concern, the disappointing results of the juvenile ideal. *Kent, supra* 383 U.S. at 556, 86 S.Ct. at 1054–1055; *Gault, supra* 387 U.S. at 17–31, 87 S.Ct. at 1438–1446; *Winship, supra* 397 U.S. at 365–367, 90 S.Ct. at 1073–1074; *McKeiver, supra* 403

U.S. at 535–536 and 544–546, 91 S.Ct. at 1981–1982 and 1985–1986; *Breed, supra* 421 U.S. at 528–530, 95 S.Ct. at 1785–1786; *Schall, supra* 467 U.S. at 294–297, 104 S.Ct. at 2425–2427 (Marshall, J., joined by Brennan and Stevens, JJ., dissenting). Reading these cases elicits a growing sense of frustration in that the Court over a span of forty years constantly criticized yet patiently abided and awaited the success of a system that was failing.

In *McKeiver,* one of the more recent cases, the Court, after an extensive discussion of the failings of the juvenile system and whether it should be abandoned, noted, "[p]erhaps that ultimate disillusionment will come one day, but for the moment we are disinclined to give impetus to it." *McKeiver, supra* 403 U.S. at 552, 91 S.Ct. at 1989–1990. The juvenile justice system will soon be 100 years old. At this point in time this Court is prepared to real—istically face and, to some extent, rebuff the system's failings.

Research and program analysis evaluations have shown that the efficacy of the juvenile system's rehabilitative institutions is challengable. Patience and the passage of time have failed to vindicate the system. Quite to the contrary, there is ample historical as well as current data to demonstrate that juvenile justice has been a consistently retrogressive social enterprise.[10] Although

10. The two major national statistical studies relied on in *Gault* for the conclusion that the juvenile system was failing, were conducted in 1967. Report by the President's Commission on Law Enforcement and Administration of Justice, *The Challenge of Crime in a Free Society* (1967); Report by President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: Juvenile Delinquency and Youth Crime* (1967). Since that time relatively few studies have been conducted, and only one with the breadth of the 1967 reports.

In 1973, the National Advisory Commission on Criminal Justice Standards and Goals issued a major report. National Advisory Commission on Criminal Justice Standards and Goals, "Corrections" and "A National Strategy to Reduce Crime", Washington, D.C., U.S.Gov. Printing Office (1973) [hereinafter cited as National Advisory Commission]. The Commission called for the closing of all large youth "prisons" and training school facilities with the overall tenor of the report best summarized by the Commission's blunt reprisal, "[t]he failure of major juve-

nile and youth institutions to reduce crime is incontestable." *National Advisory Commission, supra,* "Corrections" at 350.

One year later, after conducting the most comprehensive and in-depth examination of the juvenile system that has ever been undertaken, Congress enacted the landmark Juvenile Justice and Delinquency Prevention Act of 1974. U.S. Congress, Senate, Committee on the Judiciary, Subcommittee to Investigate Juvenile Delinquency, 94th Cong., 1st sess. (1975) [hereinafter cited as Juvenile Justice Act]. The investigators stated that the "present system of juvenile justice [was] failing miserably" and the resulting legislation was "designed specifically to prevent young people from entering our failing juvenile justice system, and to assist communities in developing more sensible and economic approaches for youngsters already in its juvenile justice system. *Juvenile Justice Act, supra* at p. 13. Although favorably touted by the most prestigious entities, *e.g.,* the National Council on Crime and Delinquency (NCCD), and a definite step toward educating citizens throughout the

there are examples of quality probation and other treatment services, the truth is that these are few and far between. The majority of our youths are falling through rehabilitative cracks. Juveniles are often either exposed to experimental therapeutic techniques that are demeaning or violate fairness, or they are banished to institutions that fail to offer any treatment or accord with even minimal constitutional requisites. *See, e.g.*, Murphy, *Our Kindly Parent ... The State–The Juvenile System and How It Works* (1977) (esp. chapters 3–5); Wooden, *supra*, ch. 1–3. The system is clearly far more punitive than rehabilitative. One scholar estimates that juveniles receive 100 times more punishment than treatment. Silberman, "Juvenile Justice" in *Criminal Violence, Criminal Justice* (1980) at 453–454.

Further, reality fails to reflect the protective and professional intentions expected of all participants in the system. In this area in particular the gap between rhetoric and reality is phenomenal. The success of the system is completely dependent upon the availability of resources and on the interest, expertise, commitment and concern of the system's participants. *Rothman, supra* at 242–243. Too often juvenile court personnel fall "far short" of being the "stalwart," sympathetic, paternalistic, and "communicating" professionals envisaged by the system. *Kent, supra* 383 U.S. at 545, 86 S.Ct. at 1049; *Rothman, supra* at 238. The "community's unwillingness" to provide funding for staff and facilities, the "insufficiency of time devoted," the "scarcity" of truly professional resources, the "inadequacy of dispositional alternatives," and the "general lack" of diagnostic expertise all contribute to the

system's failing. *Kent, supra* at 544–546, 86 S.Ct. at 1048–1050. *See generally, Worrell, supra*. Once again, time has served to exacerbate rather than absolve these problems. Our juveniles are being thrust into a precarious system where all personnel are presumed to consider the child's best interests, yet none has the time, training, resources or sometimes even the inclination to do so. Thus, as one juvenile court judge has aptly summarized, "loose procedure, high-handed methods, and crowded court calendars" have resulted in "arbitrariness" and assembly line dispositions. *Gault, supra* 387 U.S. at 19, 87 S.Ct. at 1439, in reference to Lehman, *A Juvenile's Right to Counsel in a Delinquency Hearing*, 17 Juv. Court Judges Jour. 53, 54 (1966).

Nor does the palatable terminology of the juvenile system alter this reality. The adoption of a soft vocabulary in an attempt to dispell labeling and promote professionalism has been ineffective. Words such as "detention," "juvenile delinquent," and "commitment" have proven no less severe or to carry no less of a criminal taint. *McKeiver, supra* 403 U.S. at 545, fn. 5, 91 S.Ct. at 1986 fn. 5; *Gault, supra* at 28 and 50, 87 S.Ct. at 1444 and 1455. Further, utilization of medical terminology has not rendered treatment which is medically founded. Reality reflects that the juvenile court's unique terminology consists of nothing more than euphemisms unable to alter the punitive consequences inherent in any kind of judicial intervention.

Although the denial of certain procedural protections could be countenanced by the founder's goals, when these goals fail in achievement, then the time has come for

---

country who were "unaware of the abusive practices being condoned in the name of justice," U.S. Congress, House, Committee on Education and Labor, Subcommittee on Economic Opportunity, "Oversight Hearing on the Juvenile Justice and Delinquency Prevention Act, 95th Cong., 2d sess. (1978) (testimony of M. Rector, President of NCCD, at 460), the Act had little actual impact on reforming the juvenile system. In 1980 the Act was amended, and once again the failure of the system was attacked.

   For the sake of brevity, all of the up to the moment reports and studies of the juvenile sys-

tem can be found in what is presently the most authoritative book on the subject, Ira M. Schwartz, *(In) Justice for Juveniles: Rethinking the Best Interests of the Child* (Lexington Books, 1989) (at the time of this writing this Court received an advanced copy since the book is presently being printed). Mr. Schwartz, Director of the Center for the Study of Youth Policy at the University of Michigan, brings us the most recent and well documented conclusion that the juvenile system has failed.

change.[11] *McKeiver, supra; Gault, supra; Breed, supra.* It is now poignantly evident that good intentions alone cannot replace constitutional safeguards. Reincarnated is Grandfather *Gault's* announcement that the "condition of being a boy does not justify a kangaroo court." *Gault, supra* 387 S.Ct. at 28, 87 S.Ct. at 1444. In the face of the unpredictable and arbitrary dispositional and rehabilitative atmosphere of the system, procedure must become the unifying stalwart of fairness, uniformity and predictability.

This is not to say that the rehabilitative intent of the juvenile processes should be completely overridden; nor do we mean to denigrate the admirable aspirations and ideals of the founders. Even in the face of the system's failures, we are not convinced that current practice does not contain the philosophical progeny from which a truly rehabilitative, treatment-oriented system can be created.[12] We do, however, intend to eschew the protective "label-of-convenience" and extinguish the heretofore blinding aspects of tradition, sentiment, naive faith, and habit in order to set the stage for candid judicial confrontation of the realities of the system. *See, Gault, supra* 387 U.S. at 21, 87 S.Ct. at 1440; *O'Connor v. Donaldson,* 422 U.S. 563, 586–588, 95 S.Ct. 2486, 2499–2500, 45 L.Ed.2d 396 (1975) (Burger, C.J., concurring).

The failure of the juvenile system is not merely a legalistic problem or a singular problem of the individual involved. It is a problem shared by all. Society as a whole shares not only the blame for the system's failures but also will undoubtedly carry the economic and emotional burden of its repeat offenders. *McKeiver, supra* 403 U.S. at 547–548, 91 S.Ct. at 1987–1988. We are now attempting to evolve a new methodology to truly provide a child with the best of both the juvenile and criminal worlds— the treatment model of the juvenile system and the procedural protections of the adult. Thus, while we dispel the antiquated and unrealistic resistance to procedural safeguards, we continue to embrace a rehabilitative and treatment oriented spirit.

■ Based on the foregoing analysis, we now extend the probable cause requirement of Art. I, sec. 9 and the Fourth Amendment to juvenile proceedings.[13] Our holding today represents an accommodation between the aspirations of the juvenile court and the grim realities of the system. *Gault, supra* 387 S.Ct. at 40, fn. 66, 87 S.Ct. at 1450, fn. 66. Although we are adopting another requisite of the criminal system, we find that requiring probable cause for arrest will not compel abandonment or displacement of the juvenile system's commendable rehabilitative intentions. Such a requisite places minimal fetters on police discretion in mak-

11. *Cf., Note, An Explanation of Whether Incarcerated Juveniles are Entitled by the Constitution to Rehabilitative Treatment,* 84 Mich.L.Rev. 286 (1986) arguing that denial of procedural protections predicated on pursuit of rehabilitative goals is constitutionally impermissible unless treatment is given as *quid pro quo* for deprivation of procedural safeguards); *Allen v. Illinois,* 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986) and *U.S. v. Ward,* 448 U.S. 242, 248–249, 100 S.Ct. 2636, 2641–2642, 65 L.Ed.2d 742 (1980) (even where proceeding is statutorily defined as civil, where a defendant proves that the statutory scheme is punitive in its realistic effect, it must be considered criminal and the privileges attendant to criminal proceedings must attach).

12. See, for example, the seemingly successful and unquestionably heroic examples set by pioneer states, such as Maryland, Florida, Utah, Oklahoma, Massachusetts and Georgia. Butts and Streit, *Youth Correction Reform: The Maryland and Florida Experience* (Center for the

Study of Youth Policy, September 1988); Loughran, Vleet, Rutherford, Schwartz and Marshall, *Reinvesting Youth Corrections Resources: A Tale of Three States* (Center for the Study of Youth Policy, 1987); Blackmore, Brown and Krisberg, *Juvenile Justice Reform: the Bellwether States* (Center for the Study of Youth Policy, May 1988). These systems exemplify that the only proper place for rehabilitative considerations may be at the dispositional phase of juvenile proceedings, leaving the adjudicatory phase to be conducted with all the procedural requisites of the adult system.

13. We include in our holding all juveniles covered by Title 3 of the Texas Family Code, i.e., children having engaged in delinquent conduct, V.T.C.A., Family Code Sec. 51.03(a), and children having engaged in conduct indicating a need for supervision, V.T.C.A., Family Code Sec. 51.03(b). However, we expressly preclude children encompassed by Title 2 of the Family Code (abused and neglected children).

ing decisions that concern fundamental rights of personal privacy and freedom and have the potential for particularly detrimental effects on a child's life. This holding is also in line with Texas statutory guidelines for a juvenile arrest. Section 52.01, *supra,* states,

(a) A child may be taken into custody:

. . . .

(3) by a law-enforcement officer if there are reasonable grounds to believe that the child has engaged in delinquent conduct or conduct indicating a need for supervision. . . .

The Draftsman comments to this statute states,

Prior law, Tex.Rev.Civ.Stat.Ann. art. 2338–1, sec. 11, authorized "any peace officer or probation officer . . . to take into custody any child who is found violating any law or ordinance, or who is reasonably believed to be a fugitive from his parents or from justice, or whose surroundings are such as to endanger his health, welfare or morals."

Subsection (a), based upon section 13 of the Uniform Juvenile Court Act, substantially narrows this grant of authority. A child may now be taken into custody only where there is reasonable grounds or probable cause exists to indicate that the child committed delinquent acts, engaged in conduct indicating a need for supervision, or violated the conditions of his probation. Thus, the broad authority to take a child into custody when his "surroundings are such as to endanger his health, welfare, or morals," is eliminated.

*Draftsman Comments, supra.* Thus, the intent in drafting this section was to require probable cause to arrest a child.

Further, in light of the most recent caselaw in this area, there is great need for application of this probable cause protection. Most recently, in *Vasquez v. State, supra,* this Court held that the Article 14.-04, V.A.C.C.P., warrant requirement is not applicable to juveniles. We determined that to require a warrant would unnecessarily restrict the flexibility of protective police action. This holding was predicated upon the expectation that the officer would himself have probable cause to arrest. *Vasquez, supra* at 45. Thus, juveniles can freely be arrested without a warrant. Since there is no unbiased judicial probable cause determination prior to arrest, at the very least, law enforcement officers can be expected to personally have probable cause for a juvenile arrest and also be held responsible for a reasonable articulation of such at a later hearing. The hope is that through this requirement dubious or unjust arrests will be generally deterred and prevented from the outset.

Also relatively recently, the U.S. Supreme Court held in *Schall, supra,* that juveniles can properly be subject to pre-trial detention without a judicial determination of probable cause for up to six days. *Schall, supra* 467 U.S. at 276–277, 104 S.Ct. at 2416–2417. *See also, Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed. 2d 54 (1975). *Cf.,* V.T.C.A., Family Code Sec. 54.01 (no requirement of a judicial probable cause determination for continuous pre-trial detention). The *Schall* Court further announced that juveniles can properly be denied any opportunity to pre-trial release. *Schall, supra. Cf.,* V.T.C.A., Family Code Secs. 53.02 and 54.01(e)(1–5), (h), *supra* (allowing for pre-trial release but providing extremely liberal grounds upon which continuous pre-trial detention can be predicated). Thus, once a juvenile is arrested he can be subjected to continual incarceration for a disruptively lengthy period of time without an unbiased judicial determination that such incarceration is at all warranted. *See, generally, Worrell, supra.* This is especially true in Texas, where there is no statutory requirement of a judicial probable cause determination for pretrial detention. Sec. 54.01, *supra.* Although caselaw mandates a finding of probable cause for valid extended detention, *Moss v. Weaver, supra; Gerstein, supra,* it is not clear that such a determination is routinely made. As discussed *ante,* detention can be extremely detrimental and contra to the goals of the juvenile court, expecially when it is unjustified; thus, a minimal probable cause restriction at the

time of arrest can only serve to help prevent such detriment.

Finally, imposition of a probable cause requirement will not severely limit or disrupt proper law enforcement since it is not an ultra-restrictive requirement.[14] Rather, it was purposely designed as a realistic, practical, and workable determination to be based upon the "totality of the circumstances" presented. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Eisenhauer, supra* (Texas adoption of *Gates* ). Because the probable cause standard is a commonsense test, its application is sufficiently flexible to ensure reasonable law enforcement as well as juvenile protection. *Cf., T.L.O., supra* 469 U.S. at 364–366, 105 S.Ct. at 754–756; *Brinegar, supra* 338 U.S. at 175, 69 S.Ct. at 1310.

The probable cause requirement rests on the principal that a true balance between an individual—whether youth or adult—and the government depends on the recognition and respect of "the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead, supra* 277 U.S. at 478, 48 S.Ct. at 572 (Brandeis, J., dissenting). Today we are proudly able to afford such a right to juveniles.

■ Application of this law to the instant facts requires reversal. Appellant was arrested pursuant to a fingerprint consent order issued under Sec. 51.15, *supra.* The order stated,

BE IT REMEMBERED that on the 7th day of October 1982, permission was obtained from this Honorable Court to take the fingerprints of [appellant] in the furtherance of an investigation of an alleged [b]urglary, as provided for in the Texas Family Code. It is therefore,

ORDERED, ADJUDGED, and DECREED that the Port Arthur Police Department take fingerprints from [appellant], in the furtherance of their investigation of an alleged [b]urglary as provided for in Section 51.15 of the Texas Family Code.

The trial court and the Court of Appeals found that this order provided sufficient authority for arrest. We disagree and find that both courts misconstrued the purpose of Sec. 51.15, and the authority conferred by an order issued under it.

Section 51.15 provides, in pertinent part,

(a) No child may be fingerprinted without the consent of the juvenile court except as provided in subsection (f) of this section.

. . . .

(f) If latent fingerprints are found during the investigation of an offense, and a law-enforcement officer has reasonable cause to believe that they are those of a particular child, *if otherwise authorized by law,* he may fingerprint the child....

[emphasis supplied]. This section establishes a general prohibition against fingerprinting children and then creates two exceptions: (1) consent of the juvenile court and (2) probable or reasonable cause to believe that a particular child's prints will match those discovered during an investigation. *See, Draftsman's Comments, supra* at 534–536; 13 Tex.Tech L.Rev. 1145, 1178–1180.

We agree with the Court of Appeals to the extent that under 51.15, *supra,* probable cause is required, under both exceptions to the rule, to authorize the taking of a child's fingerprints. However, contrary

**14.** In fact, a very recent report-*Criminal Justice in Crisis*-released by the Criminal Justice Committee of the American Bar Association empirically supports this conclusion. *See,* synopsis reported in 44 Crim.L.Reptr. 2223 (1988). This report, prepared by the Criminal Justice Special Committee on Criminal Justice in a Free Society, is based on testimony from police officers, prosecutors, defense attorneys and judges. The report stated that although police and prosecutors consider some Fourth Amendment restrictions ambiguous or complex, "they do not believe that Fourth Amendment rights or their protection via the exclusionary rule are a significant impediment to crime control." Further, the report found that the Fourth Amendment promotes professionalism in law enforcement and that "the exclusionary rule appears to be providing a significant safeguard of Fourth Amendment protections for individuals at modest costs in terms of either crime control or effective prosecution" with "no discernible effect on the crime rate or law enforcement's ability to control crime."

to the lower court's conclusion, 51.15 in no way concerns or validates the arrest of a child in order to take said fingerprints. The statute expressly states that, in order to fingerprint a child, not only must one of the exceptions to the general prohibition be met, but also it must be "otherwise authorized by law." Sec. 51.15(f), *supra*. As was recognized in the Draftsman comment to the Family Code, this additional proviso explicitly emphasizes the fact that seizure of a juvenile in order to take fingerprints must comport with constitutional requisites. *Draftsman Comment, supra* at 536.

It is agreed that the officers had authority to fingerprint appellant pursuant to the 51.15 consent order; however, this order in no way conferred authority to arrest. At a suppression hearing, the State carries the burden of either producing a warrant and supporting affidavit or establishing evidentiary facts sufficient to show probable cause. *Russell v. State*, 717 S.W.2d 7, 9–10 (Tex.Cr.App.1986). In the instant case the State did not come forward with a warrant, but only introduced the fingerprint consent form. The State and the Court of Appeals seem to argue that this form takes the place of an arrest warrant, thus shifting the burden of proof back to appellant. This argument does not withstand scrutiny. The bare-bones fingerprint consent order neither facially confers authority to arrest nor evinces any factual probable cause basis. Further, there is nothing on the face of the order which exhibits any judicial intent to authorize an arrest. Having none of the protective characteristics or purposes of a warrant, this order simply cannot take the place of such.

Without a warrant, the State carried the burden of establishing the validity of the arrest. This burden the State wholly failed to carry. At the suppression hearing, the judge who issued the order did not testify and no facts were elicited concerning probable cause. Thus we find that appellant's fingerprints were taken during an illegal juvenile arrest which was not founded on probable cause. Because the only direct evidence linking appellant to the scene of the crime was his fingerprints, we cannot say beyond a reasonable doubt that their introduction made no contribution to the verdict. Tex.R.App.Proc., R. 81(b)(2). Consequently, we reverse the holding of the Court of Appeals and remand this cause to the trial court.

W.C. DAVIS, CAMPBELL, DUNCAN and BERCHELMANN, JJ., concur in the result.