In the INTEREST OF D.Z.

No. 13–93–052–CV.

Court of Appeals of Texas, Corpus Christi.

Dec. 16, 1993.

Rehearing Overruled Jan. 28, 1994.

Jaime E. Carrillo, Carlos P. Morin, Kingsville, for appellant.

Pete De La Garza, County Atty., Kingsville, for appellee.

Before SEERDEN, C.J., and DORSEY and YAÑEZ, JJ.

## OPINION

SEERDEN, Chief Justice.

This is a juvenile court action in which the State proceeded against D.Z., a child, under determinate sentencing provisions.[1] A jury found D.Z. used a deadly weapon and was guilty of capital murder. The jury also found that D.Z. needed rehabilitation, and assessed a determinate sentence of thirty-five years. By two points of error, D.Z. alleges that the State did not follow the controlling Family

---

**1.** The provisions authorizing a determinate sentence are found in Texas Family Code sections 53.045, 54.04, 54.11 and Texas Human Resources Code sections 61.079 and 61.084.

For an explanation of the statutes see Robert O. Dawson, *The Third Justice System: The New Juvenile—Criminal System of Determinate Sentencing For The Youthful Violent Offender In Texas*, 19 St. Mary's L.J. 943 (1988).

Code provisions when taking his confession, thus, the confession was improperly admitted at his adjudication. D.Z. seeks a new disposition. We reverse and remand for a new disposition hearing.

## FACTS

The record reflects that the court held two suppression hearings related to appellant's confession. The evidence related to the taking of appellant's confession, shows that on Saturday, June 27, 1992, Lieutenant Hays, in charge of the Detective Division of the Kingsville Police Department, telephoned the county's designated juvenile official, Ruben Ramos and advised that she had information that D.Z. was involved in this offense. After reviewing the officer's information, Ramos authorized Kingsville police detective Munoz and Lieutenant Hays to pick up D.Z. for questioning. The officers then went to D.Z.'s home, told him that they wanted to talk with him, and asked him to accompany them to the police station. He agreed. The officers also asked D.Z.'s mother, Mrs. Salinas, to follow them.

At approximately 5:17 p.m., the three arrived at the Detective Division. Mrs. Salinas arrived a few minutes later. Upon arrival, Munoz escorted D.Z. to his office and Hays went to the secretary's office to call the clerk to arrange for a magistrate to come and administer the statutory, Family Code section 51.09(b)(1) warnings to D.Z. Hays also called Officer Ramos about ten minutes after they arrived at the Detective Division. Hays testified that Ramos arrived between 5:45 p.m. and 5:50 p.m., about thirty minutes after her initial contact with D.Z. Hays explained that D.Z. remained in Munoz's office alone with Munoz while waiting for Ramos and the magistrate to arrive. Mrs. Salinas was not with her son in Munoz's office. She remained with Hays who explained to her the nature of the investigation of her son.

While alone in his office with D.Z., Munoz read D.Z. *Miranda* warnings which both signed at 5:18 p.m. After reading D.Z. his *Miranda* warnings, and while he and D.Z. were alone in Munoz's office awaiting the judge's arrival, D.Z. began talking about his involvement in the beating. Munoz and D.Z.

remained in Munoz's office alone for about forty-five minutes until Judge Bigger arrived at 6:00 p.m. to give D.Z. his Section 51.-09(b)(1) warnings. Munoz explained at the suppression hearing that before D.Z. received his statutory warnings from Judge Bigger he had admitted his involvement in the beating but that there was no writing made of D.Z.'s statements before D.Z. received his statutory warnings.

Judge Bigger arrived at the police station just before 6:00 p.m. and went to Munoz's office. As he entered alone to speak with D.Z., Munoz left the room. Judge Bigger gave D.Z. the Magistrate's Warnings to Juvenile, in accordance with Family Code section 51.09(b)(1), which both signed at 6:00 p.m., and then Judge Bigger left Munoz's office.

After Judge Bigger left, Munoz returned to his office and he and D.Z. remained alone in his office from approximately 6:00 p.m. until 6:55 p.m. Munoz testified that he and D.Z. worked on his confession and during that time Munoz typed out D.Z.'s confession statement. Judge Bigger testified that Munoz presented him with the type-written confession at 6:55 p.m.

Judge Bigger then entered Munoz's office and discussed the confession with D.Z. alone. During this meeting, Judge Bigger determined that D.Z. was competent to make a statement. D.Z. signed a Juvenile Rights Acknowledgement and Voluntary Statement in the presence of Judge Bigger only. Judge Bigger determined that D.Z. was aware of his waiver of rights and understood them. After D.Z. signed the statement, Mrs. Salinas went into Munoz's office and talked with her son. Ramos transferred D.Z. to a Juvenile Detention Center about 7:30 p.m.

We note that although the designated juvenile officer, Ruben Ramos, was present in the Detective Division from approximately 6:45 p.m. until he transferred D.Z. to the detention facility at 7:30 p.m., there is no evidence that he ever talked with D.Z. or that D.Z. ever appeared before him.

## DELIVERY OF JUVENILE TO COURT

By point two, D.Z. contends that the State did not comply with Family Code section

52.02 because he was taken to detective Munoz's office rather than to a designated juvenile processing office. Thus, he asserts that his confession was obtained erroneously and should have been suppressed. D.Z. asks that we reverse and remand his disposition for further proceedings.

The State responds that from the record, it might be surmised that Hayes controlled the activities of all detectives and utilization of the premises. The State asserts that because Hays immediately contacted and summoned Ramos, the juvenile officer, to the Detective Division that the State complied fully with the Family Code provisions when detaining D.Z. Finally, the State asserts that if using Munoz's office constituted a violation of section 52.02 such a violation would not result in the inadmissability of D.Z.'s statement.

■ By enacting Title 3 of the Family Code, the Legislature set out a statutory procedure covering the arrest, trial, and disposition of juveniles accused of delinquency. Police officers, courts, and others involved with these juveniles are bound to comply with the detailed and explicit procedures enacted by the Legislature in the code. *In re D.M.G.H.*, 553 S.W.2d 827, 828 (Tex.App.— El Paso 1977, no writ).

■ When an officer deems it necessary to take a child into custody, Family Code section 52.02(a) dictates what he must do. *Id.* at 193; *State v. Langley*, 852 S.W.2d 708 (Tex.App.—Corpus Christi 1993, pet. ref'd). Section 52.02(a) provides as follows:

> a person taking a child into custody, without unnecessary delay and *without first taking the child to any place other than a juvenile processing office* designated under Section 52.025 of this code shall do one of the following ... (2) bring the child before the office or official designated by the juvenile court if there is probable cause to believe that the child engaged in delin-

quent conduct or conduct indicating a need for supervision; ....

Tex.Fam.Code Ann. § 52.02(a) (Vernon Supp.1993) (emphasis ours). After officers follow the provisions of section 52.02, the decision about whether to detain the child further is to be made, not by law enforcement personnel, but rather by the intake or other authorized officer of the court, with investigative aid of law enforcement officers when requested, or by the juvenile court itself. *Comer v. State*, 776 S.W.2d 191, 194 (Tex.Crim.App.1989). The *Comer* court noted that with two exceptions the Legislature intended to restrict involvement of law enforcement officers to the initial seizure and prompt release or commitment of the juvenile offender in accordance with 52.02.[2] *Id.* at 195. Neither exception applies to the facts before us.

The *Comer* court determined that the Legislature intended that the officer designated by the juvenile court make the initial decision whether to subject a child to custodial interrogation. *Id.* at 196. The court noted that the designated individual could take a statement himself, consistent with section 51.-09(b)(1), at the detention facility, or, pursuant to section 52.04(b), he could refer the child back to the custody of law enforcement officers to take the statement. *Id.* Evidence illegally seized or obtained is inadmissable in an adjudication hearing. Tex.Fam.Code Ann. § 54.03(e) (Vernon 1986).

■ At the first suppression hearing, Lieutenant Hays and Officer Ramos testified that the Detective Division was an officially designated juvenile processing office. At the second suppression hearing, a copy of minutes from a juvenile board meeting, which both sides stipulated was a true and correct copy of the meeting minutes, showed that the designated juvenile processing office in the Detective Division of the Kingsville Police Department was actually the "Detectives Building—Chief of Detectives Office." The record of the second suppression hearing

---

**2.** The two exceptions recognized by the *Comer* court were 1) if it is the officer's intention to "bring the child before the office or official designated by the juvenile court" to the extent authorized by the juvenile court the officer may take him to the police station to do the paper work on the case, and 2) pursuant to particular guidelines promulgated by the law enforcement agency and ratified by the juvenile court, an officer may in his discretion dispose of a case without referral to the court.

reflects that the Juvenile Board designated the following rooms as juvenile interrogation rooms: 1) Sheriff Department–Room across from Keith Bray's Office; 2) Riviera County Building—Patrolman Office; 3) Police Department Main Office—Conference Room; 4) Detectives Building—Chief of Detectives Office; and 5) the Police Annex—Conference Room. Detective Munoz testified that there is no one in the Detective Division with the title "Chief of Detectives." He explained that the person in charge of the detective division is Lieutenant Hays. Therefore, he testified, Lieutenant Hays's office would be the designated office for juvenile interrogation at the Detectives Building. Munoz explained that Hays's office is located on the same floor across the lobby from Munoz's office. When asked why D.Z. was taken to Munoz's office, Munoz stated that Hays was doing other things in her office.

Additionally, the evidence shows that Officer Ramos spoke with Lieutenant Hays early in the afternoon and instructed her to "pick up" D.Z. Hays testified that Ramos arrived at the Detective Division at 5:45 p.m. while Ramos testified he arrived at 3:10 p.m. Regardless of his arrival time, the State does not show that D.Z. ever appeared "before" Ramos. *See* Tex.Fam.Code Ann. § 52.-02(a)(2) (Vernon Supp.1993); *see also Langley,* 852 S.W.2d at 710. Nor does the State show that Ramos spoke with D.Z. and then instructed Munoz to take D.Z.'s statement in accordance with Family Code section 52.-04(b).

The record before us shows that although the designated juvenile officer was at the Detective Division there is no evidence that he ever talked with D.Z. nor is there any evidence that he instructed Munoz to take D.Z.'s statement. Additionally, we note that D.Z. was not taken to one of the four designated juvenile processing offices in the area. We conclude that D.Z.'s confession was the result of an unlawful detention and illegally obtained.

In this case, D.Z. did not have a reasonable time after his illegal detention to reflect and then give an admissible statement. D.Z. was taken directly to the Detective Division and seated in an office with a police detective.

There is no evidence in the record that in the two and one-half hours that D.Z. was detained at the Detective Division, he ever saw or talked with Ramos, the designated juvenile officer, nor was he taken to a designated juvenile processing office. While D.Z. was detained he never left the detective's office and spoke only with the detective and the magistrate. The State in this case did not comply with the detailed and explicit procedures enacted by the Legislature for taking juveniles to court. After the officers initially seized D.Z. the decision about whether to detain the child further should have been made by the authorized officer of the court, Ramos. The State obtained D.Z.'s confession illegally, and thus, it was improperly admitted at adjudication. Tex.Fam.Code Ann. § 54.03(e) (Vernon 1986).

## HARM ANALYSIS

■ Because the jury can consider evidence from the adjudication hearing when assessing punishment, we must determine whether D.Z. was harmed by the improperly admitted confession. Tex.R.App.P. 81. Although juvenile proceedings are civil in nature, they have been characterized as quasi-criminal with procedural protections and due-process requirements similar to those in adult criminal prosecutions. *In re E.Q.,* 839 S.W.2d 144, 146 (Tex.App.—Austin 1992, no writ) (citing *In re R.J.W.,* 770 S.W.2d 103 (Tex.App.—Houston [1st Dist.] 1989, no writ) & *In re D.B.,* 594 S.W.2d 207, 209 (Tex.Civ. App.—Corpus Christi 1980, no writ)); see also *In re O.L.,* 834 S.W.2d 415, 419 (Tex. App.—Corpus Christi 1992, no writ). The hybrid nature of juvenile proceedings often results in gaps and ambiguities between the civil and criminal law.

■ Appellate courts apply the civil harm analysis to adjudication proceedings but it is not clear what harm analysis appellate courts are to apply when reviewing the disposition phase of a juvenile proceeding in which the State proceeds under the determinate sentencing statutes. *See In re S.B.C.,* 805 S.W.2d 1, 8 (Tex.App.—Tyler 1991, writ denied) (concluding error not harmful under civil harm standard); *In re S.C.,* 790 S.W.2d 766, 777–778 (Tex.App.—Austin 1990, writ

denied) (concluding error not harmful under civil and criminal harm standards).

D.Z. complains that because the illegally obtained confession was improperly admitted during his adjudication proceeding he must receive another disposition hearing. Because the State proceeded to sentence D.Z. under determinate sentencing guidelines which include a possible transfer to prison when he becomes eighteen, we conclude that the harm analysis applied to civil cases is inappropriate. For the following reasons, we will reverse the judgment unless we determine beyond a reasonable doubt that the error made no contribution to the punishment. Tex. R.App.P. 81(b)(2).

We note some of the differences between a conventional juvenile proceeding and a determinate sentencing proceeding. When the State chooses to proceed under determinate sentencing, the grand jury must approve the petition and the fact of approval shall be certified to the juvenile court. Tex.Fam. Code Ann. § 53.045 (Vernon Supp.1993). Additionally, the petition approved by the grand jury is an indictment for the purpose of transferring the juvenile to prison. *Id.* The juvenile may be placed in prison with adult felons after turning eighteen. Tex. Fam.Code Ann. § 51.13(c)(3) (Vernon Supp. 1993). The adjudication can be treated the same as a prior conviction for the purposes of punishment enhancement at a future criminal proceeding. Tex.Fam.Code Ann. § 51.14(e) (Vernon Supp.1993); Tex.Code Crim.Proc. Ann. art. 37.07, § 3(a) (Vernon 1987). The juvenile's records may be placed in federal and state central record depositories, such as the Texas Crime Information Center and the National Crime Information Center. Tex. Fam.Code Ann. § 51.14(c) (Vernon 1987). Also, the juvenile's fingerprints and photographs may be sent to the Texas Department of Criminal Justice. Tex.Fam.Code Ann. § 51.15(a), (c) (Vernon 1987).

Determinate sentencing provisions provide that if a child is sent to the Texas Youth Commission, the commission is prohibited from placing the child outside its institutions, releasing the child on parole, or further discharging him before the full sentence has been served without approval of the juvenile court that entered the commitment order. Tex.Hum.Res.Code Ann. § 61.081(f) (Vernon 1990). In a conventional juvenile proceeding, the maximum disposition results in confinement at the Texas Youth Commission until age twenty-one. Under the determinate sentencing scheme, the juvenile could receive anywhere in the range of one to thirty years, serving time in a Department of Corrections facility after age eighteen. *See* Tex.Fam. Code Ann. § 54.04(d)(3) (Vernon Supp.1993). This is despite the legislative directive that "an order of adjudication ... under this title *is not a conviction of a crime,* and does not impose any civil disability ordinarily resulting from a conviction or operate to disqualify the child in any civil service application or appointment." Tex.Fam.Code Ann. § 51.-13(a) (Vernon 1986) (emphasis ours).

■ The purpose of the juvenile code is to provide for the care and protection of the juvenile placing an emphasis on a program of treatment, training, and rehabilitation. *See Lanes v. State,* 767 S.W.2d 789 (Tex.1989); Tex.Fam.Code Ann. § 51.01 (Vernon 1986). We believe applying the criminal harm standard to the disposition phase of a juvenile determinate sentencing proceeding is in accordance with the stated purpose of the juvenile code. By using this analysis at disposition, we provide the best protections for the juvenile and continue the legislature's purpose in striking a balance between 1) the criminal system's goal to maintain our societal structure and protect the safety of citizens by punishing persons who violate certain basic rules of conduct, and 2) the juvenile system's primary purpose "to provide for the care, the protection, and the wholesome moral, mental, and physical development of children." Tex.Fam.Code Ann. § 51.01 (Vernon 1986).

■ The probable impact on the jury of the admission of D.Z.'s improperly obtained confession during adjudication, in light of the other evidence, was not harmless beyond a reasonable doubt to his disposition. *Harris v. State,* 790 S.W.2d 568, 587 (Tex.Crim.App. 1989); Tex.R.App.P. 81(b)(2). D.Z. did not testify at trial. We conclude that the admission of D.Z.'s improperly obtained confession was sufficiently prejudicial that, in this case,

it constituted harmful error. We cannot say that D.Z.'s confession made no contribution to his determinate sentence of thirty-five years. We sustain point two.

Because of our disposition it is unnecessary for us to address appellant's remaining point of error. Tex.R.App.P. 90(a). We reverse the disposition phase and remand for further proceedings.

DORSEY, J., concurring.

DORSEY, Justice, concurring.

I wholly concur in the opinion of the Court but write separately to express my concern about the application of the exclusionary rule.

Agents of the State in this case violated two provisions of Chapter 52 of the Family Code. The juvenile did not talk to the designated juvenile officer prior to giving a statement and the juvenile was not taken to the designated juvenile processing office. These two procedures are mandated by Article 52.02 as protections afforded a juvenile. The issue that is more difficult is whether the violation of these provisions results in the juvenile's statement being inadmissible in a court proceeding.

The legislature has adopted two exclusionary rules in its chapter of the Family Code that relate to delinquent children. The first is in Section 51.09(b) that states, in essence, that any statement by a child is admissible in evidence if the detailed warnings set out in that section are given the child. The other provision, relied on by this Court, is in Section 54.03(e) in which it states: "An extra judicial statement which was obtained without fulfilling the requirements of this title or of the constitution of this state or the United States, may not be used in an adjudication hearing." Because the requirements of this Title were not met, Section 54.03(e) mandates that the resulting statement may not be used in an adjudication hearing.

The legislature may provide additional protections to a juvenile that are not mandated by the state or federal constitution. It is not the function of a court to determine whether the legislature was wise in setting out such detailed procedural safeguards and then requiring that any statement taken in violation

of any of them be inadmissible. The function of a court is to apply the law as it is given by the lawmaker, the legislature, even though we may disagree that the harsh remedy of exclusion of evidence should not be required by a technical breach of the procedural rules.