**In the Matter of C. R.**

**No. 03–97–00785–CV.**

Court of Appeals of Texas,
Austin.

May 27, 1999.

Rehearing Overruled Aug. 12, 1999.

Linda Icenhauer-Ramirez, Icenhauer-Ramirez & Hubner, P.C., Austin, for Appellant.

Ronald Earle, District Attorney, Karyn D. Scott, Assistant District Attorney, Austin, for Appellee.

Before Justices JONES, KIDD and YEAKEL.

J. WOODFIN JONES, Justice.

A jury adjudicated appellant C. R., a juvenile then 15 years old, guilty of engaging in delinquent conduct[1] by committing the offense of capital murder.[2] Based on the jury's finding, the 98th District Court of Travis County, sitting as a juvenile court, rendered a determinate sentence of thirty years' confinement.[3] Appellant appeals the adjudication of delinquency, asserting that the court erred in denying his motion to suppress his written statement. We will reverse and remand.

1. *See* Tex. Fam.Code Ann. § 54.03 (West 1996 & Supp.1999).

2. *See* Tex. Penal Code Ann. § 19.03 (West 1994).

3. *See* Tex. Fam.Code Ann. §§ 53.045(a)(2), 54.04(d)(3) (West Supp.1999). The determinate sentence provisions were amended after the offense at issue occurred. *See* Act of May 28, 1997, 75th Leg., R.S., ch. 669, §§ 2, 6, 1997 Tex. Gen. Laws 2265, 2266 (Tex. Fam. Code Ann. § 54.04); Act of June 2, 1997, 75th Leg., R.S., ch. 1086, §§ 8, 11, 53, 1997 Tex. Gen. Laws 4179, 4183-85, 4199 (Tex. Fam. Code Ann. §§ 53.045, 54.04). The prior version of the statute applies to this case; however, we cite to the current code for convenience.

## FACTUAL AND PROCEDURAL BACKGROUND

Because this appeal is limited to a review of a suppression determination, we consider only the evidence presented at the hearing on appellant's motion to suppress. *See Rachal v. State,* 917 S.W.2d 799, 809 (Tex.Crim.App.1996). The following facts are derived from the testimony of the various witnesses during the suppression hearing.[4]

In December 1995, officers from the Austin Police Department responded to a 911 telephone call reporting a robbery and shooting at Zilker Park in Austin. Upon arriving at the scene, officers encountered Marta Hernandez, who directed them to the body of her estranged husband, Roberto Giral. Giral had suffered a fatal gunshot wound to the head. Hernandez told detectives she and Giral had been talking when they were attacked by three men, but she could not describe the attackers.

During the investigation into Giral's death, detectives received two 911 telephone calls from persons claiming Hernandez had orchestrated her husband's murder. One of the calls came from Yvonne Fuentes, who explained that her daughter's boyfriend, Tony Moreno, had bragged to her daughter about his involvement in the shooting. Moreno claimed the victim's wife offered him money to commit the murder, and gave the first names of two individuals as persons who were also involved. Detectives searched their database for known associates of Moreno having either of those names. Their search revealed appellant.

Detective Fuentes,[5] an officer assigned to the murder investigation, testified that three detectives were dispatched to locate appellant in order to verify the statements of Yvonne Fuentes and her daughter, and to determine if appellant had any helpful information. Detective Fuentes testified that at this point he considered appellant to be a potential witness, not a suspect. Detectives Campa and Pedraza, two of the officers sent to locate appellant, testified that they found appellant at home about 9:30 p.m. and asked him to accompany them to the police station to answer questions regarding a pending investigation. Both indicated that appellant was not placed under arrest, that he voluntarily accompanied the officers to the station, and that he could have refused to go. Fuentes, Campa, and Pedraza all testified that appellant arrived at the police station between 9:30 and 9:45 p.m.

Appellant testified that the officers arrived at his house much earlier in the evening, closer to 7:30 p.m. He told the officers he could not go to the police station because his mother was not home and she had left him in charge of taking care of his younger sisters; he agreed to accompany the officers only upon being assured the questioning would not take very long. He stated he arrived at the station around 7:45 p.m.

Once at the police station, appellant was immediately taken into an interview room, where he was questioned alone by Pedraza. At some point during the questioning, appellant implicated himself in the murder. Pedraza testified that he immediately stopped the interview and reported the situation to Fuentes and Campa. While Officers Pedraza and Fuentes testified that appellant implicated himself at about 10:55 p.m., Campa remembered this occurring shortly after 9:45 p.m. or possibly a bit later.[6] All the officers agreed that questioning ceased as soon as appellant

---

4. Because the relevant testimony at trial did not vary to any significant degree from that offered at the suppression hearing, the outcome of this appeal would be the same even if we were to expand our review and consider trial testimony.

5. There is no indication in the record that Detective Fuentes is related to Yvonne Fuentes.

6. Although we only consider testimony from the suppression hearing, we note that at trial Officer Campa testified appellant implicated himself nearer to 11:00 p.m. This variance in

implicated himself; at that point appellant was no longer a witness, but rather was considered by the officers to be "in custody" as a suspect. Each officer testified that appellant was immediately taken to a juvenile processing office at the police station, and that Kent Anschutz, a magistrate judge, was contacted to administer juvenile warnings.

Anschutz's testimony confirmed that he was called at home about 11:00 p.m. and asked to come to the police station to administer juvenile warnings. He arrived at the station at approximately 11:30 p.m. and administered the juvenile warnings to appellant shortly after midnight. Appellant was then returned to Pedraza, who drafted appellant's written statement outlining appellant's version of the events surrounding the murder. Thereafter, appellant spoke again with Anschutz, who confirmed that appellant did not want to change anything in the written statement and was signing the statement voluntarily. Appellant signed the statement at approximately 2:45 a.m., and was then transferred to Gardner Betts Juvenile Detention Center.

Pedraza testified that throughout the night, appellant never asked to go home, never asked to contact his mother, and appeared to be very calm and interested in assisting in the investigation. In contrast, appellant testified he continuously expressed his desire to go home, and complained he was hungry and tired. He also stated that Pedraza told him if he did not actually pull the trigger, he could not be convicted of murder, and as soon as he told

the truth he could go home. Appellant stated that he finally acquiesced and told Pedraza of the events surrounding the murder. Appellant confirmed that he eventually did see a magistrate, but claims this occurred only after he had related his complete story in detail several times to Pedraza at Pedraza's insistence.

The State filed an original petition alleging that appellant had engaged in delinquent conduct by committing the offense of capital murder, namely, causing the death of Giral for the promise of remuneration; the petition sought a determinate sentence. Appellant filed a motion to suppress his written statement, which was denied. At trial, the statement was read into evidence. In his statement, appellant admitted being involved in the planning and eventual execution of the murder, but contended he waited in the bushes while the murder was actually carried out by either Moreno or Jose Medrano.

A jury found appellant guilty of engaging in delinquent conduct and assessed a thirty-year sentence. Appellant timely filed this appeal, asserting in three points of error that the trial court improperly denied his motion to suppress his written statement because it was taken in violation of former section 51.09(b) [7] and sections 52.02(a) and (b) [8] of the Texas Family Code.[9]

## DISCUSSION

### Section 52.02(b) Violation

In his third point of error, appellant contends that his written statement should

testimony is not material to the outcome of this appeal.

7. *See* Act of May 11, 1973, 63d Leg., R.S., ch. 544, § 1, 1973 Tex. Gen. Laws 1460, 1462 (Tex. Fam.Code Ann. § 51.09, since amended). Subsection (b) of former section 51.09 was redesignated as section 51.095 of the Family Code subsequent to the date of offense at issue. *See* Act of June 2, 1997, 75th Leg., R.S., ch. 1086, § 4, 1997 Tex. Gen. Laws 4179, 4181 (Tex. Fam.Code Ann. § 51.095). All references to former section 51.09(b) refer to the version applicable prior to redesignation.

8. *See* Tex. Fam.Code Ann. §§ 52.02(a)–(b) (West 1996 & Supp.1999).

9. Former section 51.09(b) requires a juvenile be taken before a magistrate and given certain statutory warnings prior to making a written statement. *See* Tex. Fam.Code Ann. former § 51.09(b) (West 1996). Section 52.02(a) provides that a person taking a child into custody must take the child "without unnecessary delay" to a juvenile processing office. *See id.* § 52.02(a). Section 52.02(b) provides that a person taking a child into to custody must "promptly" give notice to a parent of this action. *See id.* § 52.02(b).

have been suppressed based on the officers' failure to contact his mother as required by section 52.02(b) of the Texas Family Code. Section 52.02(b) states in pertinent part: "A person taking a child into custody shall promptly give notice of his action and a statement of the reason for taking the child into custody, to: (1) the child's parent, guardian, or custodian:...." Tex. Fam.Code Ann. § 52.02(b) (West 1996).

Appellant argues initially that he was "in custody" from the moment he arrived at the police station, but that his mother was not called until many hours later, in violation of section 52.02(b). The State disagrees that appellant was legally in custody the moment he arrived at the station, but concedes he was in custody once he implicated himself. We need not decide at what point appellant was legally in custody, however, because, even adopting the State's theory that appellant was not in custody until he implicated himself at approximately 11:00 p.m., we conclude for the reasons set forth below that appellant's written statement was taken in violation of section 52.02(b).[10] For purposes of this appeal, therefore, we assume without deciding that appellant was not in custody until he implicated himself.

■ In denying appellant's motion to suppress, the trial court implicitly concluded that the officers had complied with section 52.02(b). In reviewing the court's rulings, we must grant almost total deference to the trial court's determination of the historical facts, as well as the court's rulings on "application of law to fact questions" (also known as "mixed questions of law and fact") if the resolution of those ultimate questions turns on an evaluation of witness credibility and demeanor. *See Guzman v. State,* 955 S.W.2d 85, 89 (Tex. Crim.App.1997). However, we review *de novo* "mixed questions of law and fact" not falling within this category. *See id.* The issue of whether the officers complied with section 52.02(b) is a mixed question of law and fact; for the reasons explained below, however, the resolution of the issue in the present case does not turn on an evaluation of witness credibility or demeanor. Accordingly, we will review the trial court's decision *de novo.*

Appellant's mother, Reynalda Reynosa, testified that on the night her son was taken to the police station for questioning, she was away from home playing bingo. When she called home about 8:30 p.m. to check on her children, her eldest daughter told her that appellant had left with some police officers. She returned home about 10:10 p.m. Finding that her son had still not returned, she telephoned the police station. Reynosa spoke with a woman who told her the detectives were very busy, but would return her call. Sometime around 11:00 she called again and was once again told the detectives would return her calls. Finally, she received a call from a Spanish-speaking officer. She was unable to say with certainty what time it was when she received the call, but she was sure it was after midnight and likely closer to 1:00 a.m. Reynosa testified that she was not told her son was in custody, but rather was told that he was helping the officers "on a job" and that it was not necessary for her to come to the station. She stated that the officers did not contact her again until around 5:00 a.m. when she was told her son had been taken to Gardner Betts.

Asked whether he had attempted to contact appellant's mother, Officer Pedraza admitted he had not. Although Officers Fuentes and Campa and Magistrate Anschutz also testified, none were asked any questions regarding any attempts to contact appellant's mother. Thus, even viewing the evidence in the light most favorable to the State, a minimum of one hour elapsed between the time the State concedes appellant was taken into custody and the time his mother was initially contacted.

10. While we express no opinion as to whether appellant was in custody from the moment he arrived at the station, we note that if he were in custody upon his arrival, the section 52.02(b) violation would be even more blatant.

According to the State's own witnesses, during this hour, the officers had time to take appellant to the juvenile processing center, speak with an assistant district attorney, and contact a magistrate judge for the issuance of warnings. Yet the State apparently made no attempt to contact appellant's mother, notwithstanding the two messages Ms. Reynosa asserts she left by this time, an assertion not contradicted by the State. The State offered no reason for the delay.

Moreover, we need not decide whether a mere delay of one to two hours, standing alone, constitutes a violation of the requirement in section 52.02(b) that a parent, guardian, or custodian be called "promptly" after a child is taken into custody. The statute requires more than just a telephone call—the parent *must be told that the child has been taken into custody and the reasons why.* *See* Fam.Code § 52.02(b). Appellant's mother testified that when she was initially contacted, she was not told her son was in custody, much less given a reason for his being in custody. She testified as follows regarding her exchange with the Spanish-speaking officer who called between midnight and 1:00 a.m. on the night in question:

Q. What did this person tell you?

A. This person told me, or I asked him, why is [C.] there. I need to be there with him. Why is he there with you.

Q. And what did they say?

A. For me not to worry, that [C.] was fine. That he was just cooperating with them on a job.

Q. Did they tell you want kind of job?

A. I asked what it was about; that I needed to know. And then they said that I didn't need to know. That they could not tell me.

Q. Did you go to the police station?

A. No. I didn't go because they told me not to go.

Q. Did they tell you why you couldn't go?

A. I asked her why was it that I couldn't go, did they notice the age of—[C.'s] age. They said that they—yes, but that my presence was not necessary.

Even if this Court were to disregard all of appellant's mother's testimony as to the content of the conversation, the State offered nothing to refute it, leaving the record devoid of any evidence that the officers told her they had taken appellant into custody or gave her "a statement of the reason for taking the child into custody." Fam.Code § 52.02(b).

■ The burden was on the State to show that appellant's statement was taken in compliance with section 52.02(b) of the Family Code. *See* Tex.Code Crim. Proc. Ann. art. 38.23(a) (West Supp.1999).[11] Nonetheless, the State offered no evidence that the statute had been complied with. The testimony of appellant's mother would support a finding that section 52.02(b) had been *violated.* Even if the trial court disbelieved everything testified to by appellant's mother, however, this would not constitute affirmative proof that the officers *complied* with section 52.02(b). Because the trial court's resolution of the compliance issue did not turn on the credibility of any witness, we review the trial court's decision *de novo.* *Cf. Loserth v. State,* 963 S.W.2d 770, 773 (Tex.Crim.App.1998) (holding that mixed questions of law and fact do not "turn" on evaluation of credibility and demeanor of State's witnesses when, even if court believed everything testified to by witnesses, testimony would still not "add up to" what is needed to decide underlying substantive issue); *Hunter v. State,* 955 S.W.2d 102, 105 n. 4 (Tex.Crim.App.1997).

■ The State presents two arguments in support of its position that the officers complied with section 52.02(b). First, the State argues that the statute was not violated because appellant's mother was

11. The Family Code expressly makes Chapter 38 of the Code of Criminal Procedure applicable to juvenile proceedings. *See* Fam.Code § 51.17(c).

aware as early as 8:30 p.m. that appellant had gone with police officers to the police station. We reject the proposition that being aware that one's child has "gone with police officers to the police station" is the same as being aware that one's child is in custody for a criminal offense. Having a child *in custody* is obviously a more serious situation; accordingly, we can easily imagine a parent confronted with that knowledge being motivated to take some action—calling an attorney, personally traveling to the police station, etc.—where the same parent might not take any action on knowing merely that their child had "gone with some officers." In any event, it is the parent who should have that option. It is not the place of the investigating authorities to decide that, because a parent did not respond to the information that her child had gone with some officers to the police station, they did not need to fulfill the statutory requirement to notify the parent when the child was later taken into custody.

■ The State next argues that section 52.02(b) was not violated because there is no requirement in the Family Code that a parent must be with the juvenile when he chooses to waive his rights and give a statement. The State again ignores the fact that, by requiring the arresting authorities to give notice of the arrest to a parent, the legislature gave the choice of whether or not to be present to the parent. The legislature may well have concluded that juveniles are more susceptible to pressure from officers and investigators and that, as a result, justice demands they have available to them the advice and counsel of an adult who is on their side and acting in their interest. The fact that the Family Code does not mandate that a parent be present when a child chooses to waive his rights in no way excuses compliance by the police with the notification requirement in section 52.02(b).

Having reviewed the evidence admitted at the suppression hearing, we conclude that the State presented no evidence that appellant's statement was obtained in compliance with section 52.02(b) of the Family Code.

■ Both the Texas Court of Criminal Appeals and the Texas Supreme Court have recently reaffirmed the strictness of the Family Code's provisions relating to the arrest and prosecution of juveniles. In *Le v. State*, 993 S.W.2d 650 (Tex.Crim.App. 1999), the court of criminal appeals construed the effect of a violation of a Family Code provision, closely related to the one at issue here, declaring mandatory procedures for persons taking juveniles into custody. Whereas subsection (b) of section 52.02 dictates who must be notified of the juvenile's arrest, subsection (a) of that section limits what may be done with the arrested juvenile and dictates where he must be taken. *See* Fam.Code §§ 52.02(a), (b). In *Le* the arresting authorities had violated the requirements of subsection (a) that an arrested juvenile be brought, without unnecessary delay, to an office or detention facility designated by the juvenile court. The arresting officer had, instead, taken the juvenile to the homicide division of the Houston police department, where the juvenile had given a statement. In the absence of evidence that the homicide division was an office or detention facility designated by the juvenile court, the court held that the juvenile's statement was illegally obtained and inadmissible. The court also reminded law enforcement officials that the legislature has mandated a different set of rules for juveniles:

The Legislature has set forth very specific actions which a law enforcement officer must take when arresting a juvenile. We are aware of the disturbing increase in juvenile crime in our state, and we are sympathetic to law enforcement's efforts to deal with violent juvenile offenders. Nevertheless, we must not ignore the Legislature's mandatory provisions regarding the arrest of juveniles. We informed the citizenry, a decade ago in a unanimous opinion [in *Comer v. State*, 776 S.W.2d 191 (Tex.Crim.

App.1989)], of the Legislature's clear intent to reduce an officer's impact on a juvenile in custody. Today we remind police officers of the Family Code's strict requirements.

*Le v. State,* at 655; *see also In re C.O.S.,* 988 S.W.2d 760, 42 Tex. Sup.Ct. J. 461 (April 1, 1999) (holding that juvenile court's failure to give juvenile admonishments required by Family Code was fundamental error).

◼ The Family Code provides that "[a] child alleged to have engaged in delinquent conduct ... need not be a witness against nor otherwise incriminate himself. *An extrajudicial statement which was obtained without fulfilling the requirements of this title ... may not be used in an adjudication hearing."* Fam.Code § 54.03(e) (emphasis added). Accordingly, we conclude that the trial court abused its discretion when it denied appellant's motion to suppress and improperly admitted appellant's written statement into evidence at trial.[12] *See In re R.R.,* 931 S.W.2d 11, 14 (Tex. App.—Corpus Christi 1996, no writ) (holding juvenile statement inadmissible where record contained no evidence child was taken to juvenile processing office or presented to designated juvenile officer, in violation of section 52.02(a) of Family Code); *In re D.Z.,* 869 S.W.2d 561, 563 (Tex.App.—Corpus Christi 1993, writ denied) (same).

### Harm Analysis

◼ Having determined that the trial court erred in failing to suppress appellant's statement, we must now consider whether appellant was harmed by the improperly admitted evidence. The Texas Rules of Appellate Procedure contain two standards for determining whether trial court error requires reversal, one applicable to civil cases and one applicable to criminal cases. *See* Tex.R.App. P. 44.1, 44.2. As a threshold issue, we must first determine whether to apply the civil standard or the criminal standard.

◼ While adjudication of delinquency of a minor is technically a civil proceeding, it is quasi-criminal in nature. *See In re M.A.F.,* 966 S.W.2d 448, 450 (Tex.1998); *In re J.R.,* 907 S.W.2d 107, 109 (Tex. App.—Austin 1995, no writ). The Family code provides that the Texas Rules of Criminal Evidence (now incorporated into the Texas Rules of Evidence) apply to juvenile trials. *See* Fam.Code § 51.17. The admission of a minor's extrajudicial statement is an evidentiary matter. *See* Fam.Code § 54.03(e). Because the criminal rules of evidence govern evidentiary matters, logic dictates that the criminal harm analysis should govern our review of the erroneous admission of evidence during an adjudication hearing.

Our conclusion is supported by the recent Texas Supreme Court decision in *In re M.A.F.,* 966 S.W.2d at 449–50. There, the court determined that Texas Rule of Appellate Procedure 30(b)(7) (now numbered as rule 21.3(f)) applied to the juvenile adjudication proceeding at issue even though it is expressly designated as applying to criminal cases. *See id.* The court relied on the fact that the rule has a "unique evidentiary function" because it concerns barring evidence not admitted during trial. *See id.; see also In re R.S.C.,* 940 S.W.2d 750, 752 (Tex.App.—El Paso 1997, no writ) (issue of whether appellant waived his complaint regarding trial court's denial of motion to suppress is governed by criminal rules because criminal rules are applied to evidentiary matters); *cf. In re J.R.,* 907 S.W.2d at 109 ("Because of the context in which the juvenile court can order restitution, we deter-

---

12. In reviewing a suppression determination, reversal is proper only if the trial court abused its discretion and the decision is unsupported by the record. *Rachal v. State,* 917 S.W.2d 799, 809 (Tex.Crim.App.1996). The reviewing court must view the record and all reasonable inferences therefrom in the light most favorable to the trial court's ruling. *Villarreal v. State,* 935 S.W.2d 134, 138 (Tex. Crim.App.1996). Here, reversal is proper because the trial court's implied finding that the officers had complied with section 52.02(b) is wholly unsupported by the record.

mine that the rules of restitution in criminal cases should apply.").

Our conclusion is further bolstered by the analysis found in *In re D.Z.*, 869 S.W.2d at 565–66, where the court applied the criminal harm analysis standard to review an improperly admitted confession. The court held that the criminal standard is particularly appropriate when the juvenile is sentenced under the determinate sentencing guidelines because these include a possible transfer to prison. *See id.; see also In re D.V.*, 955 S.W.2d 379, 380 (Tex.App.—San Antonio 1997, no writ). Like the juvenile in *D.Z.*, appellant in the present case was given a determinate sentence and complains on appeal of an improperly admitted confession.

For the foregoing reasons we will apply Rule 44.2, governing reversible error in criminal cases, to determine whether the trial court's error requires reversal.[13] *See* Tex.R.App. P. 44.2. There are two types of error provided for in Rule 44.2: constitutional error and "other error" (i.e., non-constitutional error). Each type has a different review standard. If the trial court committed constitutional error, the judgment must be reversed unless the reviewing court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. *See* Tex. R.App. P. 44.2(a). Non-constitutional error, on the other hand, must be disregarded unless it affects substantial rights of the defendant. *See* Tex.R.App. P. 44.2(b).

We need not decide whether the violation of section 52.02(b) of the Family Code constituted constitutional error because, even assuming the error was non-constitutional, we believe the admission of appellant's statement affected his substantial rights and thus cannot be deemed harmless.[14] A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App.1997). A conviction should not be overturned for such error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim.App.1998). The United States Supreme Court has construed the nearly identical federal harmless error rule as follows:

> If, when all is said and done, the [court's] conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, *or if one is left in grave doubt*, the conviction cannot stand.

*O'Neal v. McAninch*, 513 U.S. 432, 437–38, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (emphasis in original) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *see also Lopez v. State*, 990 S.W.2d 770 (Tex.App.—Austin 1999, no pet.); *Reeves v. State*, 969 S.W.2d 471, 491 (Tex.App.—Waco 1998, pet. ref'd).

In the present case, appellant did not testify at the adjudication hearing. Because of the potentially dramatic effect of a written confession on the decision-making

---

**13.** Although we apply the reversible error standard applicable to criminal cases, we note that, under the facts of this case, the result would be the same even if we applied the standard applicable to civil cases.

**14.** Although the error in the present case flows from the failure to comply with a statutory mandate, the error is arguably constitutional error because it implicates the constitutional right against self-incrimination. *See Easley v. State*, 986 S.W.2d 264, 267 (Tex. App.—San Antonio 1998, no pet.).

process of a jury, this Court has grave doubts that the introduction of appellant's written statement had no effect on the outcome of the proceeding. Thus, after examining the record as a whole, we cannot say with fair assurance that the error did not influence the jury, or had but a slight effect. We therefore conclude that the denial of appellant's motion to suppress affected appellant's substantial rights and therefore constitutes reversible error.

Because we hold that section 52.02(b) was violated and that the violation was harmful, we need not address appellant's remaining issues on appeal.

## CONCLUSION

Having found that appellant's statement was taken in violation of section 52.02(b) of the Family Code, that the trial court abused its discretion in denying appellant's motion to suppress, and that the trial court's error was not harmless, we reverse the judgment of the trial court and remand the cause to that court for further proceedings.