Opinion issued December 23, 2004















In The
Court of Appeals
For The
First District of Texas




NO. 01-03-01011-CR




PATRICIA ANN RAY, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 339th District Court
Harris County, Texas
Trial Court Cause No. 956241 




OPINION ON MOTION FOR REHEARING
          On November 18, 2004, we issued an opinion affirming the trial court’s
judgment. On December 6, 2004, appellant, Patricia Ann Ray, filed a motion for
rehearing. We overrule appellant’s motion for rehearing and substitute this opinion
for our previous opinion. Our November 18, 2004 judgment, affirming appellant’s
conviction, remains unchanged. 
          Appellant was certified to stand trial as an adult for capital murder, found
guilty by a jury, and given a mandatory life sentence.


 In two issues, appellant
contends that the trial court erred in denying her motion to suppress and in admitting
into evidence an excerpt from her co-defendant’s custodial statement.
          We affirm. 
Background
          At around four a.m. on August 24, 2002, appellant, who was then 16 years old,
and her fifteen-year-old boyfriend, Thomas Vargas, entered the home of eighty-one-year-old Veda Marie Sutton under the pretext of using Sutton’s telephone for an
emergency. Soon after entering the home, Vargas violently attacked and killed
Sutton. As appellant stood by, Vargas repeatedly hit Sutton with a piece of metal.
Vargas then stabbed Sutton with a knife and an ice pick. The teenagers then took
numerous items belonging to Sutton, set the house on fire, and drove away in Sutton’s
car. Later in the morning, officers with the Alvin Community College Police
Department arrested Vargas and appellant for unauthorized use of a motor vehicle
and evading arrest. Because Sutton’s murder had occurred in Pearland, Detective H.
Hunter of that city’s police department arrived at the scene of the teens’ arrest. After
the officers from the two jurisdictions conferred to determine how the investigation
would proceed, appellant and Vargas were transported to the Brazoria County
Juvenile Detention Center. After arriving at the detention center at approximately
10:00 a.m., Detective Hunt tried, without success, to obtain from appellant a
telephone number for her mother. Appellant did not provide the authorities with a
number until 12:00 p.m. Efforts were then made to notify appellant’s mother of her
daughter’s arrest and whereabouts. Although continuing attempts were made to call
the mother, the authorities did not reach her until 4:30 p.m. 
          Between 1:42 p.m. and 2:33 p.m., appellant received the statutorily required
warnings from a magistrate and gave a tape-recorded statement to police. Based on
the Texas exclusionary rule,


 appellant filed a motion to suppress the taped statement. 
Appellant asserted, inter alia, that the statement was taken in contravention of the
parental-notification requirements of Family Code section 52.02(b). In particular,
appellant asserted that the officers “took little action to find one of [appellant’s]
parents” before taking the statement. See Tex. Fam. Code Ann. § 52.02(b) (Vernon
Supp. 2004-2005). Following an evidentiary hearing, the trial court denied
appellant’s motion to suppress. In support of its ruling, the court orally stated on the
record that the requirements of the parental notification statute had been met. 
                                            MOTION TO SUPPRESS
          In her first point of error, appellant contends that the trial court erred by
denying her motion to suppress the taped statement. 
Standard and Scope of Review
          We review a trial court’s ruling on a motion to suppress for an abuse of
discretion. Balentine v. State, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002).           Applying this standard, we afford deference to the trial court’s determination
of the historical facts but decide de novo whether the trial court erred by misapplying
the law to the facts. See Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). 
If no fact findings are filed, we presume that the trial court made implicit findings of
fact that support its ruling, provided these facts are supported by the record. See
Carmouche v. State, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). We review de
novo application-of-law-to-fact questions that do not turn on an evaluation of
credibility and demeanor. See Guzman, 955 S.W.2d at 89. 
          In this case, whether the requirements of Family Code section 52.02(b) were
satisfied is an application-of-law-to-fact question. See Vann v. State, 93 S.W.3d 182,
184 (Tex. App.—Houston [14th Dist.] 2002, pet. ref’d) (applying de novo review to
question of compliance with 52.02(b)). In making this determination, we will view
the evidence at the suppression hearing in the light most favorable to the trial court’s
ruling and review de novo the trial court’s resolution of the question. See id.
 
Requirement of Prompt Notification
          Family Code section 52.02(b) requires that a person taking a child into custody
promptly give notice of the person’s action, and a statement of the reason for taking
the child into custody, to the child’s parent, guardian, or custodian. Tex. Fam. Code
Ann. § 52.02(b). When a juvenile defendant seeks to suppress a statement allegedly
obtained in violation of section Family Code 52.02(b), the burden of proof is initially
on the defendant to show a violation of that section. See Roquemore v. State, 60
S.W.3d 862, 869 (Tex. Crim. App. 2001). If the defendant demonstrates such
violation, then the burden shifts to the State to prove compliance with section
52.02(b). See id.
          On appeal, appellant first contends that her mother was not “promptly” notified
when she was taken into custody, and, for that reason, her confession should have
been suppressed. The Court of Criminal Appeals has repeatedly recognized the
necessity of strict compliance with the Family Code provisions governing the
handling of juvenile defendants. See id. at 870 (citing Baptist Vie Le v. State, 993
S.W.2d 650, 655 (Tex. Crim. App. 1999) and Comer v. State, 776 S.W.2d 191, 196
(Tex. Crim. App. 1989)). Undoubtedly, this strict-compliance requirement applies
to section 52.02(b). See In re J.B.J., 86 S.W.3d 810, 815 (Tex. App.
Beaumont—2002, no pet.). However, strict compliance with this provision has never
been interpreted by a court to mean that a statement cannot be taken from a juvenile
until notification has been given to the parent or guardian; rather, courts have striven
to determine whether the notification was given “promptly,” as the statute requires. 
See, e.g., id. Because the term “promptly” is not statutorily defined for purposes of
section 52.02(b), courts have taken different approaches in determining whether
parental notification was promptly given under the particular facts presented. 
          As recognized by the Fourteenth Court of Appeals, Texas appellate courts have
considered the following factors in determining whether parental notification was
“prompt”: (1) the length of time the juvenile had been in custody before the police
notified a parent, guardian, or custodian; (2) whether notification occurred after the
police obtained a statement; (3) the ease with which the police were ultimately able
to contact the appropriate adult; and (4) what the police did during the period of
delay. Vann, 93 S.W.3d at 185 (citing Gonzales v. State, 67 S.W.3d 910, 911 (Tex.
Crim. App. 2002); Hampton v. State, 36 S.W.3d 921, 924 (Tex. App.—El Paso 2001),
rev’d, Hampton v. State, 86 S.W.3d 603 (Tex. Crim. App. 2002); Hill v. State, 78
S.W.3d 374, 382-84 (Tex. App.—Tyler 2001, pet. ref’d); In re C.R., 995 S.W.2d 778,
783 (Tex. App.—Austin 1999, pet. denied)); cf. J.B.J., 86 S.W.3d at 815 (applying
“totality of the circumstances” approach to determine whether parental notification
was promptly given). We find the factors listed in Vann to be both pragmatic and
definitive. And, as an amalgam of the considerations that other courts have used, this
approach has a solid basis in Texas jurisprudence. Thus, we apply the four factors
listed in Vann to the evidence presented in this case to determine whether the
notification was promptly given.
(1) Length of Time Appellant was in Custody Before Notification

          At the suppression hearing, Detective Hunt confirmed that appellant was
arrested by the Alvin Community College Police “a little before 8 a.m.” Appellant’s
mother was notified that her daughter was in custody at 4:30 p.m. Thus,
approximately eight and one-half hours passed between the time appellant was taken
into custody and her mother was notified.
          (2) Whether Notification Occurred after the Police Obtained a Statement
          Parental notification in this case occurred after the statement was taken. 
          (3) Ease with which Notification Was Ultimately Made
          Detective Hunt testified that he and appellant arrived at the juvenile detention
center at approximately 10:00 a.m. At that time, he asked appellant for her mother’s
telephone number. The detective stated that he wanted to contact appellant’s mother
to inform her of appellant’s “situation” and whereabouts. Detective Hunt was unable
to obtain the number from appellant. He described her demeanor as “distraught” and
stated that she was crying. Detective Hunt confirmed that he would have contacted
appellant’s mother at that time if appellant had given him a telephone number. 
          Melissa Callaway, an employee of the Brazoria County Juvenile Probation
Department, testified at the suppression hearing that she heard Detective Hunt ask
appellant for her mother’s telephone number, but appellant did not provide him with
the number. She described appellant’s demeanor as “very, very emotional.” 
          Callaway informed Detective Hunt that she had previously dealt with appellant
at the detention center. Callaway told Detective Hunt that she had a rapport with
appellant and believed that she could obtain the mother’s number. Detective Hunt
turned custody of appellant over to Callaway at 11:30 a.m., after Callaway told him
that she would attempt to obtain the contact number from appellant.
          In her brief, appellant points to evidence indicating that Detective Hunt knew
she had previously been processed at the juvenile detention center and that a file
existed that possibly contained a contact number for appellant’s mother. Appellant
suggests that Detective Hunt should have made efforts to obtain these other files at
the time of appellant’s arrest in this case. When cross-examined on this point,
Detective Hunt explained the reason that he did not attempt to obtain these files was
because they were not his files and the files would have contained “old information.”
          Callaway testified that she had previously dealt with appellant in the juvenile
system and believed that she could obtain the mother’s number from appellant. After
speaking with appellant for 20 or 30 minutes, Callaway obtained the mother’s work
and mobile telephone numbers from appellant. Callaway then telephoned appellant’s
mother but was unable to reach her. When asked whether she had continued to call
appellant’s mother until her shift ended, Callaway responded affirmatively. Callaway
testified that her shift ended at 2:00 p.m. At that time, she gave the telephone
numbers to a “Ms. Tyus” at the detention center, who ultimately reached appellant’s
mother at 4:30 p.m.
          (4) What Law Enforcement Officials Did During Period of Delay
          The following is a time-line constructed from the evidence presented at the
suppression hearing:
          Shortly before 8:00 a.m.            Appellant and Vargas taken into custody by
Alvin Community College Police for
unauthorized use of a motor vehicle and
evading arrest
 
          8:00 a.m. to 9:30 a.m.                Appellant and Vargas remain at arrest scene;
City of Pearland investigators arrive at arrest
scene; Pearland and Alvin Community
College police confer to determine how
investigation should proceed
 
          9:30 to 10:00 a.m.                      Appellant and Vargas transported to juvenile
detention center
 
          10:00 a.m.                                  Appellant arrives at juvenile detention center
 
          10:00 a.m. to 11:30 a.m.            Detective Hunt tries to obtain mother’s
telephone number from appellant; Detective
Hunt books appellant and Vargas; authorities
waiting for magistrate to arrive to give
required warnings
 
          11:30 a.m.                                  Detective Hunt turns custody of appellant
over to Callaway 
 
          11:30 a.m. to 12:00 p.m.            Callaway speaks with appellant to obtain
mother’s telephone number
 
          Around 12:00 p.m.                     Callaway obtains mother’s work and mobile
telephone numbers from appellant
 
          12:00 p.m. to 2:00 p.m.              Callaway telephones appellant’s mother but is
unable to reach her; Callaway completes the
booking process; Callaway’s shift ends at
2:00 p.m. and she gives mother’s telephone
numbers to Tyus
 
          1:42 p.m. to 2:33 p.m.                Appellant receives warnings from magistrate
and provides tape-recorded statement
 
          4:30 p.m.                                    Appellant’s mother contacted by Tyus
Analysis Under Vann Factors
          The evidence presented relevant to the third and fourth factors weigh strongly
in favor of the State’s position that the notification was “prompt.” Although the
second, and arguably the first, factors weigh in favor of a conclusion that the
notification was not prompt, they are not alone compelling enough either to refute
that the notification was prompt or to neutralize the effect of the evidence presented
in relation to the third and fourth factors. Moreover, when viewed in the context of
the evidence relating to the third and fourth factors—rather than in isolation—the
delay in notification highlighted by the first and second factors is explained; thus, the
impact of the first and second factors is mitigated. 
          Of particular importance in this case is the evidence presented that
demonstrates that the officers made diligent efforts to notify appellant’s mother. The
evidence shows that for the first one-and-one half hours that appellant was in custody,
she remained at the scene of her arrest because it was uncertain where appellant
would be transported due to the conflicting jurisdiction of the law enforcement
agencies involved. The evidence further shows that, once at the juvenile detention
center, Detective Hunt made efforts to procure the mother’s telephone number from
appellant, but through no fault of Detective Hunt, he could not obtain the number
from her. The detective made clear in his testimony that he would have contacted the
mother at that time if appellant had provided him with her number. Callaway
confirmed that the detective tried to obtain the number from appellant. Detective
Hunt offered a reasonable explanation why he did not attempt to obtain a telephone
number that may have appeared in records from previous contacts that appellant had
with the detention center. 
          The evidence further showed that, even though she had a rapport with
appellant, it still took Callaway 20 to 30 minutes to obtain the mother’s telephone
numbers from appellant. Callaway then attempted to reach the mother for the next
two hours without success. Callaway gave the numbers to the person on the next
shift, who ultimately reached appellant’s mother at 4:30 p.m.
          Considering the factors enunciated in Vann, we conclude that the parental
notification in this case was promptly given as required by section 52.02(b). We hold
that the trial court properly denied appellant’s motion to suppress.
          We overrule appellant’s first issue.
ADMISSION OF CO-DEFENDANT’S CUSTODIAL STATEMENT
          In her second point of error, appellant complains that the trial court erred by
allowing the State to read into evidence an excerpt from Vargas’s custodial, tape-recorded statement. In that excerpt, Vargas stated that he found a piece of wrought
iron fence lying by Sutton’s front door. He confessed that he picked up the piece of
iron, brought it in Sutton’s home, and hit her with it. Vargas stated that after he hit
her, Sutton was “laying [sic] down” and begged him not to hit her again. 
          On appeal, appellant contends that the admission of the statement violated her
right to confrontation under the Sixth Amendment Confrontation Clause of the United
States Constitution and under article I, section 10 of the Texas Constitution. 
 
State Constitutional Right to Confrontation
          We begin our analysis by holding that appellant failed to preserve her article
I, section 10 complaint. The basis for appellant’s objection at trial was a federal case
construing the Sixth Amendment right to confrontation, not the article I, section 10
right found in the State constitution. Appellant never objected that the admission of
her co-defendant’s statement violated her state constitutional right to confrontation. 
Accordingly, this sub-point was not preserved for our review. See Tex. R. App. P.
33.1(a); see also Heidelberg v. State, 144 S.W.3d 535, 542-43 (Tex. Crim. App.
2004) (holding defendant failed to preserve for appellate review claim that State’s use
of defendant’s post-arrest, pre-warning silence violated state constitution when
defense failed to cite the state constitution, and record did not otherwise indicate that
objection related to state constitutional rights).
Sixth Amendment Right to Confrontation
          Since appellant was tried, the United States Supreme Court held that, without
exception, testimonial statements of witnesses absent from trial are admissible over
a Confrontation Clause objection only when (1) the declarant is unavailable and (2)
the defendant has had a prior opportunity to cross-examine. Crawford v. Washington,
--- U.S. ----, 124 S. Ct. 1354, 1374 (2004). In this case, the State does not contest that
Vargas’s statement, taken during custodial interrogation, was inadmissible under the
newly crafted test enunciated in Crawford. Instead, the State contends that the
admission of the statement was harmless error.
          Because the Sixth Amendment right of confrontation is a fundamental right,
and because a violation of that right constitutes constitutional error, we must reverse
a trial court’s judgment when Confrontation Clause error is present unless we can
determine beyond a reasonable doubt that the error did not contribute to the
conviction. See Tex. R. App. P. 44.2(a) (requiring reversal of constitutional error
unless appellate court determines beyond reasonable doubt that error did not
contribute to conviction); see also Evans v. State, 534 S.W.2d 707, 711 (Tex. Crim.
App. 1976) (concluding that error of admitting co-defendant’s statement was not
harmless beyond a reasonable doubt).
          In making this determination, we do not focus on the propriety of the outcome
of the trial. McCarthy v. State, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001). Instead,
our task is to “calculate, as nearly as possible, the probable impact of the error on the
jury in light of the other evidence.” Id. If there is a reasonable likelihood that the
error materially affected the jury’s deliberations, then the error was not harmless
beyond a reasonable doubt. Wesbrook v. State, 29 S.W.3d 103, 119 (Tex. Crim. App.
2000). 
          In this case, the State sought to convict appellant under two theories of capital
murder: (1) as a party, with Vargas acting as principal


 and (2) as a conspirator under
the law of parties.


 The jury was instructed regarding the State’s law of the parties’
theories. In addition, the jury was charged with determining whether the State had
proven beyond a reasonable doubt that Vargas caused Sutton’s death by using a
combination of the following manner and means: striking Sutton with a piece of
metal, stabbing her with a knife, and/or stabbing her with an ice pick. The trial court
admitted the excerpt from Vargas’s statement for the purpose of showing that he hit
Sutton with a piece of metal—one of the instrumentalities of the crime. 
          The excerpt from Vargas’s statement that was read to the jury imparted three
pieces of information: (1) that Vargas brought a piece of iron into Sutton’s home and
hit her with it; (2) that Sutton was lying on the floor after Vargas hit her; and (3) that
Sutton begged Vargas not to hit her again.


 Undoubtedly, Vargas’s statement
constituted direct proof that he hit her with a “piece of metal.” However, as pointed
out by the State, the statement was cumulative of appellant’s own trial testimony. 
Appellant testified that, when she saw Vargas enter Sutton’s home, he was carrying
what appellant described as a “metal pole” or “iron rod.” Appellant testified that she
witnessed Vargas repeatedly hit Sutton with the “metal pole.” Courts have held that
the wrongful admission of cumulative evidence is considered harmless. See Sterling
v. State, 800 S.W.2d 513, 520 (Tex. Crim. App. 1990) (holding that admission of
illegally obtained confession was harmless in light of second admissible confession
containing substantially same facts); see also Franks v. State, 90 S.W.3d 771, 805-06
(Tex. App.—Fort Worth 2002, no pet.) (holding that because complained-of
testimony was generally cumulative of other evidence introduced in case, no harm
attached); Mack v. State, 928 S.W.2d 219, 225 (Tex. App.—Austin 1996, pet. ref’d)
(holding error is not reversible “if other evidence at trial is admitted without objection
and it proves the same fact or facts that the inadmissible evidence sought to prove”). 
          Moreover, at trial, appellant did not contest that Vargas killed Sutton. Rather,
appellant’s theory of the case was that she assisted Vargas during the commission of
the offenses because she was under duress.


 In fact, appellant gave detailed testimony
about the brutality of Sutton’s murder at the hands of Vargas. She testified that she
witnessed Vargas push his way into Sutton’s home and, without provocation,
repeatedly beat Sutton with the metal pole, then stabbed her with a knife. Appellant
stated that when she left Sutton’s house, she saw an ice pick sticking out of Sutton’s
back. She then described how Vargas poured accelerants inside the house and set it
on fire. Although the State was required to prove beyond a reasonable doubt the
manner and means by which Vargas killed Sutton, the most powerful evidence that
the State had in this regard was the live testimony of appellant, who witnessed the
murder first-hand and gave a vivid description of Vargas’s actions.
          Appellant also contends in her brief that “[t]he harm in admitting Vargas’s
confession was exacerbated by the inclusion of the portion that described how the
complainant was lying down when he hit her and was begging him not to hit her
anymore.” The impact of this portion of the statement was also over-shadowed by
appellant’s trial testimony. Appellant conveyed to the jury that after Vargas initially
hit Sutton, she fell to the floor. Appellant told the jury that Vargas made Sutton get
up and walk to the kitchen. Appellant testified that this was difficult for eighty-one-year-old Sutton. Once in the kitchen, Vargas continued to beat Sutton with the piece
of metal. After the teenagers began searching the house for items to steal, appellant
screamed, alerting Vargas that Sutton was still “moving.” Appellant testified that
Vargas then stabbed Sutton with a knife.
          The autopsy report and the testimony of the assistant medical examiner also
mitigated the impact of Vargas statement. The medical evidence showed that Sutton
had numerous skull fractures, brain hemorrhaging, multiple stab wounds and
abrasions, and a broken arm. The medical evidence also showed that the ice pick
Vargas used to stab Sutton had penetrated her heart. The autopsy photographs
published to the jury also showed the brutality of Vargas’s actions. When asked
whether Sutton likely “suffered a great deal before she died,” the assistant medical
examiner responded affirmatively.
          In light of the other evidence introduced at trial, the impact of admitting the
excerpt from Vargas’s statement was minimal. We conclude that there is not a
reasonable likelihood that the error of admitting the statement materially affected the
jury’s deliberations. We hold that the error was harmless beyond a reasonable doubt.


 
          We overrule appellant’s second point of error.
CONCLUSION
          We affirm the judgment of the trial court.




                                                             Laura Carter Higley
                                                             Justice

Panel consists of Justices Nuchia, Hanks, and Higley.

Publish. Tex. R. App. P. 47.2(b).